BALONICK LAW OFFICE, INC.

Barney Balonick (SBN#277776)
10100 Santa Monica Blvd #1700
Los Angeles, CA 90067
310.703.1755
310.703.1799 (facsimile)
bhb@balonicklaw.com

Attorneys for Plaintiff
KENT SALVESON

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENT SALVESON, an individual, | CASE NO.: |
| Plaintiff, | COMPLAINT FILED: |
| vs. | |
| HAL ROSS KESSLER, ESQ., an individual;<br><br>Defendant. | COMPLAINT FOR ATTORNEY BREACH OF FIDUCIARY DUTY:<br>(1) BREACH OF DUTY OF LOYALTY<br>(2) BREACH OF DUTY OF CONFIDENTIALITY<br>INVASION OF PRIVACY: FALSE LIGHT |

Plaintiff KENT SALVESON, ("Salveson" and/or "Plaintiff"), by and through his attorneys, based on experience and investigation and the independent investigation of counsel and information and belief, alleges against Defendant HAL ROSS "CORKY" KESSLER ("Kessler and/or Defendant") as follows:

## INTRODUCTION

1.      On March 2, 2017, Mr. Salveson retained the Defendant as his lawyer to draft a 26 U.S.C. § 181 Opinion letter (the "181 letter"/ "Section 181") for one of Mr. Salveson's entities. Additionally, the Defendant also agreed to represent Mr. Salveson individually for three other matters (See Attached Ex. "A" retainer agreement(s) incorporated by reference).

2.      Once the retainer agreements were executed and funded on March 2, 2017, the attorney-client relationship was formed, and Defendant Kessler owed to Mr. Salveson his *absolute and complete fidelity*, because Defendant Kessler's duties of loyalty and confidentiality were at all times designed to encourage Mr. Salveson to trust Defendant Kessler. As such, it was at all times herein Defendant Kessler's duty to protect Mr. Salveson in every possible way, and is therefore a violation of that fiduciary duty for Defendant Kessler to assume a position adverse to his client or worse – to exploit his client.

3.      This Case is about Defendant Kessler's breach of his fiduciary duty and the evidence will show that Defendant Kessler not only breached his fiduciary duty, but he did it with the intent to harm his former client.

4.      On October 21, 2021, a cinematographer was tragically shot and killed while on the movie set of "Rust" which garnered national attention. Variety Magazine, a well-known Los Angeles-based entertainment magazine, naturally covered this tragedy but also focused its attention on the producers of the film. In addition to writing a piece about the tragedy - on December 24, 2021, it published a story about the Plaintiff even though he had absolutely no involvement with the film in any respect (See Attached Ex. "B" and incorporated by reference) (the "Article").

5.      Variety needed a source for the Article's theme – "Rust" Producer's Key Adviser – *Her Dad – pushed tax shelters and hid income*. The source of the Article – Mr. Salveson's former attorney – Defendant Kessler.

6.      Defendant Kessler conveyed every private communication he had with Mr. Salveson to the Variety reporter, attributed statements during the attorney-client relationship that were never made and indeed false, and even investigated some of Mr. Salveson's tax cases to smear Mr. Salveson and fed this information to the Variety reporter – all to get free publicity even at the high cost to be paid by his former client.

7.      The lifeblood of the entertainment industry is publicity and Defendant Kessler needed publicity because his legal career is virtually invisible in Los Angeles. Not surprisingly, Defendant Kessler had nothing to do with the Rust film, but to "get his name in the tabloids" he happily volunteered damaging information about his former client. Clearly, Defendant Kessler breached his fiduciary duty he always owed to Mr. Salveson, and this duty continued even after Mr. Salveson fired Defendant Kessler for his incompetence.

Defendant Kessler Breached His Duty Of Loyalty

8.      Defendant Hal "Corky" Kessler, a Chicago-based lawyer that lacked the skill set and intellect to make it as a proper entertainment attorney in Los Angeles and violated his duty of loyalty when he sold out his client (technically, former client) to Variety Magazine. Variety ran a "hit-piece" on Mr. Salveson, and it was Defendant Kessler that spent hours with Variety providing this information.

9.      The reason: Kessler's legal career never garnered the success he falsely advertised about himself, so when he saw an opportunity to get his name mentioned in Variety, he jumped up and took it and put his client Mr. Salveson in the middle of a journalistic frenzy.

10.     Defendant Kessler should know – he will pay dearly for his betrayal.

///

<u>Defendant Kessler Breached His Duty Of Confidentiality</u>

11.     Defendant Kessler was Mr. Salveson's attorney, and Mr. Salveson divulged confidential information to him during the representation. Subsequent to this representation, without any notice to Mr. Salveson and certainly without Mr. Salveson's consent, Defendant Kessler then relayed conversations he previously had with Mr. Salveson to the reporter at Variety. Even though Mr. Salveson was not involved with the Rust film, Variety pivoted reporting on the shooting and instead developed an entire story about Streamline Global Productions ("Streamline"), a production company for the movie.

12.     The tenor of the article was that unqualified executive producers were involved with the production, trying to put a causal link between those involved with the production and the shooting. Defendant Kessler provided the information to stoke this fire by assisting the reporter – and stated "...This was a nightmare waiting to happen..." insinuating that Streamline (a U.S. motion picture and finance company) should not be given executive producer credits due to a lack of competency with film work. An interesting opinion for Defendant Kessler to render, since Streamline and Mr. Salveson terminated his legal services due to his own incompetence. Indeed, without Defendant Kessler's cooperation, Variety would never have even learned of Mr. Salveson's involvement with Streamline,

which was blown far out of proportion but used to sensationalize the Article – all to the help from Defendant Kessler.

13.     It should be noted that at no time while representing Mr. Salveson did Defendant Kessler (who tries to use the same tax plan for films as Mr. Salveson) take the position that Mr. Salveson's tax planning was faulty, improper, and certainly never indicated that Mr. Salveson's tax work was fraudulent. In any event, during the course of Kessler's representation, a California CPA was needed, and Mr. Salveson used Todd Hein, CPA ("Hein"). When Defendant Kessler gave his interview to Variety, however, Mr. Kessler needed someone to support his smear campaign, so Defendant Kessler gave Mr. Hein's name to the reporter.

14.     At all times herein, Mr. Hein was a confidential part of Mr. Salveson's client file, and only consulted on confidential issues of accounting. Defendant Kessler had no right to reveal Mr. Salveson's CPA who was caught off guard when the Variety reporter contacted him. In fact, when Mr. Hein defended Mr. Salveson's tax work to the Variety reporter and effectively impeached Defendant Kessler, Defendant Kessler contacted Hein about Mr. Salveson on December 24, 2021, and said "...why did you defend Streamline...?" Defendant Kessler, in 2021 when he spoke to Variety for at least an hour, took an adverse position against the Plaintiff for no other reason than to bolster himself.

15.     As another glaring example of Defendant Kessler's breach of his duty of confidentiality, he created a false narrative to make Mr. Salveson look like he is embroiled with legal battles with the IRS, and told the Variety reporter that Mr. Salveson stated (in confidence, no less) that "...I beat the IRS..." First, any communications between Mr. Salveson and the Defendant were at all times confidential. Second, it is false – Mr. Salveson never made that statement to Defendant Kessler. Notwithstanding the falsity of the statement, Defendant Kessler conveyed this private communication for only one purpose – to make his former client look like a lawyer that engages in tax scams and then has legal disputes in tax court.

16.     It should also be noted that Defendant Kessler is not admitted to practice law in California, yet he clearly violated Ca. Bus. & Prof. Code § 6125 (committed the unauthorized practice of law) when he engaged in sufficient legal activities here in California by traveling to California, meeting his California client (the Plaintiff), and then proceeded to provide legal services by: (1) giving legal advice; (2) strategizing about California corporate formation; (3) purchasing assets by a California company; (4) interpreting tax law and the application of that law on a particular transaction; and (5) prepared legal instruments and contracts by which legal rights would be secured. All of the aforementioned acts are deemed to be the practice of law in the State of California and the Defendant, in addition to

representing joint clients without the requisite conflict waivers, damaged Mr. Salveson who at all times herein operated under the auspice that he would be afforded the protections a client is given when represented by counsel. Last, Mr. Salveson was in California when the Defendant represented him and therefore, Mr. Salveson was at all relevant times herein, afforded the protections of the California Rules of Professional Conduct during and after the Defendant's legal representation.

17.     This Case is a clear example why defendants like Kessler should not be permitted to represent parties in legal matters – he totally disregarded the cannons of ethics and then when given the first opportunity, decided to injure his former client's reputation so that other film projects could be diverted from Mr. Salveson (or his daughter's film production company, Streamline) back to himself.

18.     Better evidence for this Court to accept – the emails to Mr. Salveson when the Defendant realized that there was no escaping the fact that he not only divulged client confidences but *assisted* Variety in attacking his former client probably to jump start his "...never-going-to-make it-as-an-entertainment-lawyer..." career. (See Attached Ex. "C" and incorporated by reference)

19.     When the story broke in Variety, naturally Mr. Salveson was shocked that his former attorney would contact a reporter and make damaging statements about him, and immediately emailed Defendant Kessler demanding a retraction to

unwind the damage. Not surprisingly, the Defendant refused to retract any of his statements. Out of sheer terror for being caught as the source of the Variety article, the Defendant sent numerous emails in the hopes of avoiding the inevitability of a judgment and stated the following: "...Can we work it out...?" "...I want to sign [a statement] and help..." "...Also I want to help you..." "...All the stuff he [the reporter at Variety] said about your business is a problem..." "...You should sue Variety..."

20.    Defendant Kessler admitted that Mr. Salveson's business was damaged by the article, yet Defendant Kessler did nothing, absolutely nothing, to help Mr. Salveson. Defendant Kessler never contacted the reporter at Variety to request a clarification, clearly never requested a retraction, and the reason is obvious – Defendant Kessler is not only the source of the information, but the information was given to hurt Mr. Salveson to inure to his own financial benefit because he got what he wanted: his name repeatedly mentioned in Variety as a Section 181 expert and also hurt his former client because he was humiliated for being fired.

21.    Kessler, appropriately on the defendant-side of the pleading paper in this Case, did these unthinkable acts out of sheer jealousy and garden-variety retribution. Kessler was bitter for being fired by the Plaintiff for his incompetent work-product, angry that Mr. Salveson's daughter told others that he was fired, and

jealous that Mr. Salveson's ability to navigate Section 181 is sought after by film producers and investors, but not himself.

22.     At or near December 24, 2021, Kessler knew that he had been caught breaching his duty of loyalty and duty of confidentiality. Defendant Kessler tried to backtrack: "...Nothing was said by me. Talk to variety..." "...Sue them [Variety]..." "...Have your attorney call me..." Defedant Kessler's denials are misrepresentations, as the Article clearly *quotes* Kessler and it is highly improbable that the Variety reporter misquoted Kessler.

23.     In January 2022, Defendant Kessler begged Mr. Salveson not to sue him, and even offered to sign a declaration offering to state that *some* of the statements he made to Variety were false. The evidence will show, however, that the Variety reporter simply took notes of his conversations with the Defendant and even stated that his very first call was to the Defendant. At the commencement of the call with reporter, the Defendant volunteered his unsubstantiated opinion that "...the Streamline debt-equity structure was a fraud..." Oddly, the Defendant not only previously supported the Streamline financial plan, he tries (but fails) to promote a very similar plan using Section 181.

24.     As the attached evidence shows, Defendant Kessler was bitter that he put Streamline (or its owner, Emily Salveson) "...on the map..." but was fired. The evidence will also show that Defendant Kessler does not deserve any credit for

anyone's success, but it is clear that Defendant Kessler stated that the Streamline debt-equity structure was a fraud to bolster the information he gave to Variety, and to discredit his own former client.

25.     Even though Defendant Kessler's legal services were terminated in 2017 because his Section 181opinion letter was below the applicable standard of care, at all times herein, Defendant Kessler's duty of loyalty and duty of confidentiality continued after his termination, and Defendant Kessler was prohibited from acting in a manner that would injure his (former) client with respect to the matter involved in the prior representation.

26.     Instead of refusing to be interviewed by Variety concerning the tax deductions, and clearly instead of protecting his client, Defendant Kessler took it upon himself to cast his former client as a tax-scam artist to thwart Mr. Salveson's business. By doing the aforesaid acts in 2021, the Defendant has violated his duties of loyalty and confidentiality and cast Mr. Salveson in a false light.

**PARTIES**

27. Plaintiff is, and at all times relevant hereto an individual who is a licensed attorney in the State of California, with a business focus on tax law, and domiciled in the State of California. The Plaintiff also owns a separate solar energy business in Newport Beach, California.

28. Defendant Hal "Corky" Kessler is an attorney admitted in the State of Illinois,

and upon information and belief is a resident of Chicago, Illinois. Defendant

Kessler is not admitted to practice law in any other state.

## JURISDICTION AND VENUE

29. This Court has jurisdiction under 28 U.S.C. § 1332 because there is complete

diversity of citizenship, and the Defendant owes the Plaintiff more than

$750,0000.00. Clearly, there is more than $75,000.00 in controversy. This Court

has personal jurisdiction over the Defendant and venue in this jurisdiction is proper

pursuant to Rule 4 of the Federal Rules of Civil Procedure because: (1) the

Plaintiff is domiciled here in California.[1] In 2017, when Defendant Kessler was

retained to represent Mr. Salveson, Mr. Salveson lived in Newport Beach,

California. At all relevant times herein, the aforementioned acts by the Defendant

occurred in 2021, and the email communications that are attached to this

Complaint were sent while Mr. Salveson was in his office in Newport Beach,

California. In addition to living in Newport Beach, California, Mr. Salveson's tax

business is in Newport Beach, California, and so is his solar energy business. The

principal place of business of the Defendant is located in the City of Chicago and

State of Illinois, and when the Defendant leaked the private information of his

---

[1] The Plaintiff also has a residence in Nashville, Tennessee, but his domicile is in California where his family lives and where his business operates. None of the acts in this Complaint occurred while the Plaintiff was in Tennessee.

former client, he leaked the information to Variety, an American Media Company located in Los Angeles, California; (2) the Defendant transacted and conducted business in the City of Los Angeles, County of Los Angeles, and should have expected to have been sued here as he traveled here to advise Mr. Salveson, and was paid five (5) separate retainers from Mr. Salveson's businesses or from funds from Mr. Salveson's bank accounts (all funds were transferred from California banks) in addition to agreeing to represent Mr. Salveson who was and is a California attorney; (3) Defendant's conduct and acts giving rise to this action occurred and has occurred in the City of Los Angeles, County of Los Angeles; and/or (4) the Defendant should have expected to be subject to the jurisdiction of the California courts wherein he solicited Plaintiff's money and business. Venue is also proper in this judicial district pursuant to 28 U.S.C. § 1331 (b)(2) as a substantial part of the events or omissions giving rise to the action occurred in this judicial district.

## FACTUAL ALLEGATIONS

30.    Defendant Kessler's representation of Mr. Salveson started and ended in short order. In 2017, Streamline needed an attorney versed in Section 181 tax deductions for films, and Defendant Kessler held himself as an attorney well-versed in 181 tax deductions for work for films.

31.    Defendant Kessler was supposed to provide a Section 181 opinion letter for one of Streamline's films, but not only was the Section 181opinion letter untimely causing Streamline to lose at least one of its film projects, it was well below the standard of care. (See Attached Ex. "D" and incorporated by reference) Therefore, Defendant Kessler was terminated with immediate effect and required to refund part of the retainer that was paid to him.

32.    The evidence attached to this Complaint is telling. Defendant Kessler generated five (5) separate retainer agreements – all on the same day, all of them involving different legal matters, all identifying that the Plaintiff is a client or that the Plaintiff is responsible for the entity in which Defendant Kessler agreed to represent. What is missing? The requisite conflict waivers required when an attorney engages in joint representation, as the Defendant did here. Why? Because Defendant Kessler pays no mind to the important notion of conflicts of interest, which is why he put his interests ahead of Mr. Salveson. What else is missing? Any notation on the retainer agreements that Defendant Kessler is only authorized to practice law in Illinois and not admitted in California even though he was representing California residents and providing legal advice that impacts his California clients.

33.    This is an action for an attorney's intentional, malicious, and deplorable violation(s) of his fiduciary duties owed to the Plaintiff. The Defendant revealed

privileged information with the intention of harming his former client and furthering his own career and did this by casting his former client in a false light when he conveyed to Variety that Mr. Salveson runs fraudulent tax schemes – nothing could be further from the truth, and Defendant Kessler at all times herein knows it.

34.     At all times herein, Defendant Kessler, as Mr. Salveson's lawyer, owed a fiduciary duty to Mr. Salveson. That fiduciary duty included both the duty of loyalty and duty of confidentiality. The Defendant breached this duty when he gave long interviews with a reporter at Variety and conveyed that Mr. Salveson's IRC Section 181 tax work was suspect, told the reporter that Mr. Salveson's tax work for debt-equity structure was a fraud, and then stated that Mr. Salveson's solar energy project was as problematic and fraud-based as his tax work for film production.

35.     One of the executive producers for the Rust film is Mr. Salveson's daughter, but when the story broke, a reporter at Variety contacted Defendant Kessler who held himself out a Section 181 expert. Instead of discussing the Defendant's alleged knowledge of Section 181, the Defendant chose to besmirch his former client who had absolutely no involvement with the film. Defendant Kessler did not even have the courtesy to call Mr. Salveson to let him know that a reporter from

Variety was making inquiries of him. Instead, Defendant Kessler was focused only on himself and sullied Mr. Salveson's reputation as a lawyer to garner publicity.

36.     The total owed by the Defendant to Mr. Salveson is more than $750,000.00. Mr. Salveson never even had the chance to discuss, let alone deny any of the statements in the piece, and by the time it was published, Defendant Kessler had already revealed confidential statements - leveraged to make it look as if Mr. Salveson is always in the crosshairs of the IRS ("...I beat the IRS..."). The Defendant did this intentionally to ruin Mr. Salveson's reputation as an attorney because his business focus is on tax law, and since the Defendant refused to issue a retraction, the Plaintiff will request to provide proof of other damages to be proven at trial.

### COUNT I – BREACH OF FIDUCIARY DUTY – BREACH OF DUTY OF LOYALTY
### (Against Defendant Hal Kessler)

37.     Plaintiff re-adopts and re-alleges Paragraphs 1-36 as though fully set forth herein.

38.     At all relevant times herein, Defendant Kessler owed Mr. Salveson a fiduciary duty because he was Mr. Salveson's attorney and provided legal services to a California client with matters concerning California law. The attorney-client relationship is a fiduciary relationship of the highest character. *Cox. V. Delmas* (1983) 99 Cal. 104. Every lawyer owes an undivided duty of loyalty and fidelity to

his client. *Allow v. State Bar* (1971) 3 Cal.3d 924. Mr. Salveson was afforded the protections of the California Rules of Professional Conduct.

39.    At all relevant times herein, Defendant Kessler, as Mr. Salveson's fiduciary, was bound to protect his client in every possible way, and this duty was never terminated even after Defendant Kessler's representation ended in 2017.

40.    Defendant Kessler breached his fiduciary duty when he gave substantial and damaging facts to the reporter at Variety, facts that Defendant Kessler could only have known about when he was Mr. Salveson's attorney.

41.    One of the most severe breaches of the Defendant's duty of loyalty – when he decided to "investigate" the IRS cases and gave the allegations and findings to the reporter at Variety.

42.    Attached as Ex. "B" is a true and correct copy of the Variety article where the Defendant is quoted as follows: "...according to Kessler, it was Kent Salveson who had hired him to draft some documents. Kessler **told** Variety that he spoke with the elder Salveson several times on the phone about how to adapt his tax incentive model to the film business. He recalled Savleson saying that he "beat the IRS" in an earlier tax dispute..."

43.    Attached as Ex. "D" and incorporated by reference is a true and correct copy of the Section 181 opinion letter the Defendant drafted. Upon anticipated expert

review, it is expected that experts will agree that Defendant Kessler's Section 181 opinion letter is well below the standard of care.

44.     Continuing to breach his duty of loyalty, Defendant Kessler told the reporter that "...Just as with the solar energy investment (Mr. Salveson's business), Streamline's film investment model relies heavily on debt..." and then the Defendant provided the opinion that investors are avoiding tax obligations by entering into a loan agreement with Mr. Salveson making it appear as if Mr. Salveson is engaged in a tax evasion scheme.

45.     In fact, Defendant Kessler told the Variety reporter "...Salveson appeared to be far more diligent about claiming credits and deductions than he was about reporting income..."

46.     The Defendant, at all relevant times herein, knew that Mr. Salveson was not operating a tax evasion scheme, or violating any of the IRS tax codes. As a result of his lengthy interviews with the Variety reporter, as well as his investigation into some of the private legal matters previously before the IRS, which was provided to damage Mr. Salveson's reputation, Mr. Salveson was materially harmed. The Defendant should be required to issue a retraction of his statements and request that Variety publish his retraction. In addition, the Defendant should be ordered to pay Mr. Salveson $750,000.00 for not only assisting the Variety reporter but taking an adverse position against his client with the intention of damaging him. Indeed,

Mr. Salveson's damages were proximately caused by Defendant Kessler's breach of his duty of loyalty because instead of protecting his client, Defendant Kessler assisted the Variety reporter in running a hit-piece because Defendant Kessler wanted to not only damage Mr. Savleson for firing him, but to hurt his future business.

47.     Additionally, because Defendant Kessler's conduct was willful, malicious, oppressive, and done with a conscious disregard for Mr. Salveson's rights, punitive damages should be awarded against Defendant Kessler, to punish and deter future conduct. At no time should any lawyer investigate his or her own client (especially without the client's consent) when the intention of that investigation was to reveal private information and then use it to financially damage his own client to bolster his or her own pecuniary gain.

**COUNT II – BREACH OF FIDUCIARY DUTY – BREACH OF DUTY OF CONFIDENTIALITY**
**(Against Defendant Hal Kessler)**

48.     Plaintiff re-adopts and re-alleges Paragraphs 1-47 as though fully set forth herein.

49.     It is the duty of every attorney "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." [Bus. & Prof.C. § 6068(e)(1)].

50.     The duty to maintain client confidences and secrets survives termination of the attorney-client relationship: "[A]n attorney is forbidden to do either of two things after severing his relationship with a former client. He may not do anything which will injuriously affect his former client in any matter in which he formerly represented him *nor may he at any time use against his former client knowledge or information* acquired by virtue of the previous relationship." [*Wutchumna Water Co. v. Bailey* (1932) 216 C 564, (emphasis added); see also CRPC 1.9(c)]

51.     Defendant Kessler not only breached his duty of confidentiality, but he did also do so intentionally. Defendant revealed Mr. Hein, the CPA used during the representation and pulled from the CPA in 2017 certain tax information that was used in collaboration with Mr. Salveson's representation – all to cast Mr. Salveson's tax work as fraudulent. At no time was Defendant Kessler allowed to reveal Mr. Hein, and certainly not permitted to reveal any facts of the representation.

52.     The most glaring breach of his duty of confidentiality – when Defendant Kessler told the Variety reporter that Mr. Salveson told him: "...I beat the IRS..." Another breach of the duty of confidentiality: Kessler told the Variety reporter that "...ultimately Kent Salveson said he was dissatisfied with the work..." "...The whole experience left a sour taste, Kessler says..." "...I did a lot of work and he [Salveson] didn't like it..." Defendant Kessler was never allowed to repeat

anything Mr. Salveson stated to him, and not even allowed to state what Mr. Salveson did or did not like.

53.     Defendant Kessler fabricated statements to bolster his own Section 181 work and as a form of retribution because he was fired. Defendant Kessler made this statement because Variety was developing a story to discredit Streamline, and Defendant Kessler gave them the perfect opportunity – ruin the tax lawyer that provided tax guidance for Streamline's investors. By committing these acts, Defendant Kessler hoped that the investors and producers would retain his services.

54.     The Defendant should be ordered to pay Mr. Salveson $750,000.00 for not only assisting the Variety reporter but taking an adverse position against his client with the intention of damaging him. Indeed, Mr. Salveson's damages were proximately caused by Defendant Kessler's breach of his duty of confidentiality because instead of protecting his client, Defendant Kessler revealed confidential client communications to the Variety reporter because Defendant Kessler wanted to not only damage Mr. Salveson for firing him, but to hurt his future business.

55.     Additionally, because Defendant Kessler's conduct was willful, malicious, oppressive, and done with a conscious disregard for Mr. Salveson's rights, punitive damages should be awarded against Defendant Kessler, to punish and deter future

conduct. At no time should any lawyer reveal confidential client communications to a third party with the intention to bolster his or her own pecuniary gain.

### COUNT III – FALSE LIGHT
**(Against Defendant Hal Kessler)**

56.     Plaintiff re-adopts and re-alleges Paragraphs 1 through 55 as though fully set forth herein.

57.     Mr. Salveson seeks to recover damages based upon the Defendant's invasion of Mr. Salveson's privacy by placing Mr. Salveson in a false light. The Defendant made a public disclosure of a private fact about the Plaintiff when he claimed that there was intense scrutiny of Mr. Salveson's tax work, and then implied that Mr. Salveson was facing millions of dollars of tax liability due to his Section 181 tax work. These disclosed facts were not true, and the Defendant knew that these statements were false when he made them to the Variety reporter in or around December 2021. Moreover, the facts disclosed by the Defendant (e.g., "...I beat the IRS..." and implying that after his failed business, he shifted to renewable energy tax credits as a subsequent form of improper use of the tax code) were false and portrayed Mr. Salveson in a false light. The false light in which the Plaintiff was placed would be highly offensive to a reasonable person.

58.     The Defendant had knowledge or acted in reckless disregard of the falsity of his publicized facts and the false light in which the Plaintiff would be placed.

59.     This public disclosure caused Mr. Salveson to sustain special damages, and at no time did the Defendant have any authority to make any statements concerning Mr. Salveson – the aforementioned false statements are contained in the Article. It is unknown if the Defendant made additional statements that have yet to be reported.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, KENT SALVESON, prays for judgment as follows:

PURSUANT TO COUNT I – BREACH OF FIDUCIARY DUTY – DUTY OF LOYALTY

1. Defendant, jointly and severally, his officers, agents, servants, representatives, employees, attorneys, parents, subsidiaries, related companies, partners, successors, predecessors, assigns, distributors, and all persons acting for, with, by, through or under them, and each of them, be required to pay actual damages in amounts no less than $750,000.00.

2. Defendants be required to pay actual damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiff's election;

3. Defendant be required to pay for punitive damages of at least $750,000.00, and for all other permissible fees of recovery.

4. For such other and further relief as is just and proper.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, KENT SALVESON, prays for judgment as follows:

PURSUANT TO COUNT II – BREACH OF FIDUCIARY DUTY – DUTY OF

CONFIDENTIALITY

1. Defendant, jointly and severally, their officers, agents, servants, representatives, employees, attorneys, parents, subsidiaries, related companies, partners, successors, predecessors, assigns, distributors, and all persons acting for, with, by, through or under them, and each of them, be required to pay actual damages in amounts no less than $750,000.00.

2. Defendants be required to pay actual damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiff's election;

3. Defendant be required to pay for punitive damages of at least $750,000.00, and for all other permissible fees of recovery.

4. For such other and further relief as is just and proper.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff, KENT SALVESON, prays for judgment as follows:

PURSUANT TO COUNT IIII – INVASION OF PRIVACY – FALSE LIGHT

1. Defendant, jointly and severally, his officers, agents, servants, representatives, employees, attorneys, parents, subsidiaries, related companies, partners, successors, predecessors, assigns, distributors, and all persons acting for, with, by, through or under them, and each of them, be required to pay actual damages in amounts no less than $750,000.00.

2. Defendants be required to pay actual damages increased to the maximum extent permitted by law and/or statutory damages at Plaintiff's election;

3. Defendant be required to pay for punitive damages of at least $750,000.00, and for all other permissible fees of recovery.

4. For such other and further relief as is just and proper.

DATED:  February 26, 2022          By: BARNEY BALONICK

BALONICK LAW OFFICE, INC.
Attorneys for Plaintiff

EXHIBIT A

EARL A. DEUTSCH (1924-2010)
PAUL M. LEVY (RETIRED 2014)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
KENNETH W. FUNK
PHILLIP J. ZISOOK
JOEL A. STEIN
KAREN KAVANAGH MACK
DENNIS E. FRISBY
BRIAN D. SAUCIER
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
LAUREN LUKOFF

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED
SUITE 1700
225 WEST WASHINGTON STREET
CHICAGO, ILLINOIS 60606

_____

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1859

_____

JENNIFER ROJAS
ALENA JOTKUS

_____

COUNSEL
ALVIN J. HELFGOT
MARSHALL D. KROLICK
MELVYN H. BERKS

March 2, 2017

<u>Via E-Mail</u>

Streamline Global Group Film Fund, LLC
c/o Kent Salveson and Emily Hunter Salveson
1600 Dove Street, Suite 315
Newport Beach, CA 92660

RE:   Draft Legal Opinion Regarding 181 Films That Will Be Contained In The Streamline
      Global Group Film Fund, LLC Private Placement Memorandum

Dear Kent and Emily:

We are pleased to have the opportunity to be of service to you (the "Client").  We look forward
to working with you and will do our best to provide the highest quality business services to you
in a responsive, efficient manner.

Fundamental to a sound relationship is a clear understanding of the terms and conditions upon
which we will be providing legal services to you.  Accordingly, the purpose of this letter is to
clarify and confirm these terms and conditions.

<u>Scope of Services</u>.

You asked that Deutsch, Levy & Engel, Chartered ("DLEC"), represent you in the following
matters: Draft Legal Opinion Regarding 181 Films That Will Be Contained In The Streamline
Global Group Film Fund, LLC Private Placement Memorandum.

<u>Limitations on Obligation</u>.

The Client acknowledges that we are not the Client's general counsel and that our acceptance of this
engagement does not involve an undertaking to represent the Client or its interests in any matter
other than that described above. Furthermore, the Client acknowledges that our representation does
not entail a continuing obligation to advise the Client concerning subsequent legal developments that
might have a bearing on the Client's affairs generally or, after the completion of the matter as to
which we are representing the Client, subsequent legal developments related to or that might have a

Salveson
Provide Legal Opinion for
Streamline Global Group Film Fund, LLC
March 2, 2017
P a g e | 2

bearing on that matter.  We may or may not hereafter undertake additional matters and services.  If we elect to do so, such additional matter and services will be memorialized by a supplemental written agreement to do so which will be an addendum to this Agreement.

The purpose of this letter is to provide the Client and our law firm (the "Firm") with a written memorandum of the terms and conditions under which the Firm will undertake to represent the Client in connection with the Engagement.

Any opinions or beliefs that we express about various courses of action and the result that might be anticipated are only our best professional estimates.  They are necessarily limited by our knowledge of the facts at the time opinions are expressed and the law then in effect.  No communications are to be construed as a promise or guarantee about the outcome of any matter, including the Engagement.

The Firm's billing procedures are designed to be as simple and clear as possible.  Please ask me or our billing department any questions regarding each bill as soon as the Client receives it.  Otherwise, we will assume that the bill is accepted as rendered. It is agreed that all rendered bills are payable on receipt.  If a client's account is not paid in full on demand, we will have the right immediately to withdraw from representing the client.  If a client's bill remains unpaid for more than thirty (30) days from the billing date, a service charge at an annualized rate of twelve percent (12%) is added to the unpaid balance.

We will send bills pertaining to our representation of the Client to you.

**Security Retainer For Fees and Charges.**

**Drafting of LLC Documents**

Based on the expected scope of services required for this Project, we will bill a flat fee for services of Twenty-Five Thousand Dollars ($25,000.00).  (*We acknowledge receipt of Twelve Thousand Five Hundred Dollars ($12,500.00) by Wire Transfer on March 1, 2017.  The balance of Twelve Thousand Five Hundred Dollars ($12,500) remaining will be due on or before March 25, 2017.*)  You agree to deposit this amount with us as a security retainer for such service fees in connection with our representation for the matter when you instruct us to commence this work. Fees will be held in our segregated general trust account and disbursed into our general operating account as and when the services described herein are rendered and/or costs are incurred.  We will not expend time that will result in a bill in excess of this amount without your approval.

The Firm often communicates with clients through e-mail.  A communication may relate to a particular matter or it may provide information about our Firm or legal matters that may be of general interest.  You agree that the Firm may send you this material by electronic mail, among other means.  You also agree that we may communicate with you on matters related to the Engagement by e-mail on an unencrypted basis.

You agree that the Firm may dispose of all files and records in its possession or under its control pertaining to this Engagement at any time more than five (5) years after the Firm last performs services related to the Engagement.  Such disposal will be accomplished in a manner that will

Salveson
Provide Legal Opinion for
Streamline Global Group Film Fund, LLC
March 2, 2017
Page | 3

protect the confidentiality of such disposed files and records. You have the right to request, at any time before disposal of files, copies of any such files and records. You recognize and agree that the Firm may, at any time, discard documents, such as interim drafts and duplicates, which the Firm believes are not material to the protection of the Client's interests.

During the course of the Engagement, we may receive and produce documents related to you, the businesses of other parties involved, and otherwise in connection with the Engagement. Unless you direct us otherwise in writing, we plan to retain our files concerning the Engagement, to the extent provided in accordance with the preceding sentence, for a period of no less than five (5) years after the conclusion of the Engagement.

In any event, you may not, without our prior written consent, use written advice that we provide to you to promote, market or recommend to another party any transaction or tax-related matter. We anticipate a mutually satisfactory relationship. You, however, have the right to terminate the Firm's services upon written notice at any time. The Firm also has the right to terminate its services to you, upon written notice, in the event that any bill is not paid in full as submitted (*i.e.*, within 30 days). The Firm also has the right to terminate its services to you if you have misrepresented or failed to disclose material facts to us, you fail to cooperate with a reasonable request, or if the Firm determines, in its sole discretion, that continuing to provide services to you would create a conflict of interest or be unethical, impractical, improper or otherwise inappropriate. The total outstanding amount plus any additional charges for legal services and other client charges incurred through the effective date of withdrawal and thereafter in responding to requests from you or other attorneys representing you will be immediately due and payable upon termination of our representation. In the event of any termination of our services prior to our completion of our engagement as defined herein, we will refund any unearned retainer amount to the extent not earned by the Firm determined on a percentage completion basis.

We remind you that, in order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone who is not within the protection of the privilege.

If the foregoing meets with your approval, please print, sign and date this letter where indicated and return it to my attention. For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile or e-mail shall be treated in all manner and respects, and have the same force and effect, as an original document. Please keep a signed copy of this letter for your files.

Salveson
Provide Legal Opinion for
Streamline Global Group Film Fund, LLC
March 2, 2017
P a g e | 4

Should we work on other projects for you, we will provide an addendum to this Agreement.

We look forward to working with you.

Sincerely,

HAL "CORKY" KESSLER
kessler@dlec.com

HCK:cc

**ACCEPTED and AGREED:**

this _____ day of ___3 / 3___, 2017

STREAMLINE GLOBAL GROUP FILM
FUND, LLC

By: _____

352134-1

EARL A. DEUTSCH (1924-2010)
PAUL M. LEVY (RETIRED 2014)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
KENNETH W. FUNK
PHILLIP J. ZISOOK
JOEL A. STEIN
KAREN KAVANAGH MACK
DENNIS E. FRISBY
BRIAN D. SAUCIER
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
LAUREN LUKOFF

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED
SUITE 1700
225 WEST WASHINGTON STREET
CHICAGO, ILLINOIS 60606

———

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1859

———

JENNIFER ROJAS
ALENA JOTKUS

———

COUNSEL
ALVIN J. HELFGOT
MARSHALL D. KROLICK
MELVYN H. BERKS

March 2, 2017

**Via E-Mail**

Streamline Global Group Film Fund, LLC
c/o Kent Salveson and Emily Hunter Salveson
1600 Dove Street, Suite 315
Newport Beach, CA 92660

RE:     Draft Private Placement Memorandum for Streamline Global Group Film Fund, LLC

Dear Kent and Emily:

We are pleased to have the opportunity to be of service to you (the "Client").  We look forward to working with you and will do our best to provide the highest quality business services to you in a responsive, efficient manner.

Fundamental to a sound relationship is a clear understanding of the terms and conditions upon which we will be providing legal services to you.  Accordingly, the purpose of this letter is to clarify and confirm these terms and conditions.

**Scope of Services.**

You asked that Deutsch, Levy & Engel, Chartered ("DLEC"), represent you in the following matters: Draft Private Placement Memorandum for Streamline Global Group Film Fund, LLC.

**Limitations on Obligation.**

The Client acknowledges that we are not the Client's general counsel and that our acceptance of this engagement does not involve an undertaking to represent the Client or its interests in any matter other than that described above. Furthermore, the Client acknowledges that our representation does not entail a continuing obligation to advise the Client concerning subsequent legal developments that might have a bearing on the Client's affairs generally or, after the completion of the matter as to which we are representing the Client, subsequent legal developments related to or that might have a bearing on that matter.  We may or may not hereafter undertake additional matters and services.  If



Salveson
Draft PPM for
Streamline Global Group Film Fund, LLC
March 2, 2017
P a g e | 2

we elect to do so, such additional matter and services will be memorialized by a supplemental written agreement to do so which will be an addendum to this Agreement.

The purpose of this letter is to provide the Client and our law firm (the "Firm") with a written memorandum of the terms and conditions under which the Firm will undertake to represent the Client in connection with the Engagement.

Any opinions or beliefs that we express about various courses of action and the result that might be anticipated are only our best professional estimates. They are necessarily limited by our knowledge of the facts at the time opinions are expressed and the law then in effect. No communications are to be construed as a promise or guarantee about the outcome of any matter, including the Engagement.

The Firm's billing procedures are designed to be as simple and clear as possible. Please ask me or our billing department any questions regarding each bill as soon as the Client receives it. Otherwise, we will assume that the bill is accepted as rendered. It is agreed that all rendered bills are payable on receipt. If a client's account is not paid in full on demand, we will have the right immediately to withdraw from representing the client. If a client's bill remains unpaid for more than thirty (30) days from the billing date, a service charge at an annualized rate of twelve percent (12%) is added to the unpaid balance.

We will send bills pertaining to our representation of the Client to you.

**Security Retainer For Fees and Charges.**

**Drafting of LLC Documents**

Based on the expected scope of services required for this Project, we will bill a flat fee for services of Eighteen Thousand Dollars ($18,000.00), plus Four Hundred Seventy-Five Dollars ($475.00) for filing fees. (*We acknowledge receipt of Nine Thousand Dollars ($9,000.00) by Wire Transfer on March 1, 2017. The balance of Nine Thousand Four Hundred-Seventy Five Dollars ($9,475.00) remaining will be due on or before March 25, 2017.*) You agree to deposit this amount with us as a security retainer for such service fees in connection with our representation for the matter when you instruct us to commence this work. Fees will be held in our segregated general trust account and disbursed into our general operating account as and when the services described herein are rendered and/or costs are incurred. We will not expend time that will result in a bill in excess of this amount without your approval.

The Firm often communicates with clients through e-mail. A communication may relate to a particular matter or it may provide information about our Firm or legal matters that may be of general interest. You agree that the Firm may send you this material by electronic mail, among other means. You also agree that we may communicate with you on matters related to the Engagement by e-mail on an unencrypted basis.

You agree that the Firm may dispose of all files and records in its possession or under its control pertaining to this Engagement at any time more than five (5) years after the Firm last performs services related to the Engagement. Such disposal will be accomplished in a manner that will

Salveson
Draft PPM for
Streamline Global Group Film Fund, LLC
March 2, 2017
P a g e | 3

protect the confidentiality of such disposed files and records.  You have the right to request, at any time before disposal of files, copies of any such files and records. You recognize and agree that the Firm may, at any time, discard documents, such as interim drafts and duplicates, which the Firm believes are not material to the protection of the Client's interests.

During the course of the Engagement, we may receive and produce documents related to you, the businesses of other parties involved, and otherwise in connection with the Engagement. Unless you direct us otherwise in writing, we plan to retain our files concerning the Engagement, to the extent provided in accordance with the preceding sentence, for a period of no less than five (5) years after the conclusion of the Engagement.

In any event, you may not, without our prior written consent, use written advice that we provide to you to promote, market or recommend to another party any transaction or tax-related matter. We anticipate a mutually satisfactory relationship. You, however, have the right to terminate the Firm's services upon written notice at any time. The Firm also has the right to terminate its services to you, upon written notice, in the event that any bill is not paid in full as submitted (*i.e.*, within 30 days). The Firm also has the right to terminate its services to you if you have misrepresented or failed to disclose material facts to us, you fail to cooperate with a reasonable request, or if the Firm determines, in its sole discretion, that continuing to provide services to you would create a conflict of interest or be unethical, impractical, improper or otherwise inappropriate. The total outstanding amount plus any additional charges for legal services and other client charges incurred through the effective date of withdrawal and thereafter in responding to requests from you or other attorneys representing you will be immediately due and payable upon termination of our representation.  In the event of any termination of our services prior to our completion of our engagement as defined herein, we will refund any unearned retainer amount to the extent not earned by the Firm determined on a percentage completion basis.

We remind you that, in order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone who is not within the protection of the privilege.

If the foregoing meets with your approval, please print, sign and date this letter where indicated and return it to my attention.  For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile or e-mail shall be treated in all manner and respects, and have the same force and effect, as an original document.  Please keep a signed copy of this letter for your files.

Salveson
Draft PPM for
Streamline Global Group Film Fund, LLC
March 2, 2017
P a g e | **4**

Should we work on other projects for you, we will provide an addendum to this Agreement.

We look forward to working with you.

Sincerely,

HAL "CORKY" KESSLER
kessler@dlec.com

HCK:cc

**ACCEPTED and AGREED:**

this _____ day of ___3 / 3___, 2017

STREAMLINE   GLOBAL   GROUP   FILM
FUND, LLC

By: _____

352134-1

EARL A. DEUTSCH (1924-2010)
PAUL M. LEVY (RETIRED 2014)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
KENNETH W. FUNK
PHILLIP J. ZISOOK
JOEL A. STEIN
KAREN KAVANAGH MACK
DENNIS E. FRISBY
BRIAN D. SAUCIER
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
LAUREN LUKOFF

LAW OFFICES

## DEUTSCH, LEVY & ENGEL

CHARTERED
SUITE 1700
225 WEST WASHINGTON STREET
CHICAGO, ILLINOIS 60606

———

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1859

JENNIFER ROJAS
ALENA JOTKUS

———

COUNSEL
ALVIN J. HELFGOT
MARSHALL D. KROLICK
MELVYN H. BERKS

March 2, 2017

**Via E-Mail**

Kent Salveson and Emily Hunter Salveson
1600 Dove Street, Suite 315
Newport Beach, CA 92660

RE:    Draft LLC documents for SOHO Film, LLC Feature Film currently titled "Change of Heart"

Dear Kent and Emily:

We are pleased to have the opportunity to be of service to you (the "Client").  We look forward to working with you and will do our best to provide the highest quality business services to you in a responsive, efficient manner.

Fundamental to a sound relationship is a clear understanding of the terms and conditions upon which we will be providing legal services to you.  Accordingly, the purpose of this letter is to clarify and confirm these terms and conditions.

**Scope of Services**.

You asked that Deutsch, Levy & Engel, Chartered ("DLEC"), represent you in the following matters: Draft LLC documents for SOHO Film, LLC Feature Film currently titled "Change of Heart".

**Limitations on Obligation**.

The Client acknowledges that we are not the Client's general counsel and that our acceptance of this engagement does not involve an undertaking to represent the Client or its interests in any matter other than that described above. Furthermore, the Client acknowledges that our representation does not entail a continuing obligation to advise the Client concerning subsequent legal developments that might have a bearing on the Client's affairs generally or, after the completion of the matter as to which we are representing the Client, subsequent legal developments related to or that might have a bearing on that matter.  We may or may not hereafter undertake additional matters and services.  If



Salveson
Change of Heart
March 2, 2017
P a g e | 2

we elect to do so, such additional matter and services will be memorialized by a supplemental written agreement to do so which will be an addendum to this Agreement.

The purpose of this letter is to provide the Client and our law firm (the "Firm") with a written memorandum of the terms and conditions under which the Firm will undertake to represent the Client in connection with the Engagement.

Any opinions or beliefs that we express about various courses of action and the result that might be anticipated are only our best professional estimates. They are necessarily limited by our knowledge of the facts at the time opinions are expressed and the law then in effect. No communications are to be construed as a promise or guarantee about the outcome of any matter, including the Engagement.

The Firm's billing procedures are designed to be as simple and clear as possible. Please ask me or our billing department any questions regarding each bill as soon as the Client receives it. Otherwise, we will assume that the bill is accepted as rendered. It is agreed that all rendered bills are payable on receipt. If a client's account is not paid in full on demand, we will have the right immediately to withdraw from representing the client. If a client's bill remains unpaid for more than thirty (30) days from the billing date, a service charge at an annualized rate of twelve percent (12%) is added to the unpaid balance.

We will send bills pertaining to our representation of the Client to you.

**Security Retainer For Fees and Charges.**

**Drafting of LLC Documents**

Based on the expected scope of services required for this Project, we will bill a flat fee for services of Five Thousand Five Hundred Dollars ($5,500.00). (*We acknowledge receipt of Five Thousand Five Hundred Dollars ($5,500.00) by Check (Check No. 1000) dated February 24, 2017.*) You agree to deposit this amount with us as a security retainer for such service fees in connection with our representation for the matter when you instruct us to commence this work. Fees will be held in our segregated general trust account and disbursed into our general operating account as and when the services described herein are rendered and/or costs are incurred. We will not expend time that will result in a bill in excess of this amount without your approval.

The Firm often communicates with clients through e-mail. A communication may relate to a particular matter or it may provide information about our Firm or legal matters that may be of general interest. You agree that the Firm may send you this material by electronic mail, among other means. You also agree that we may communicate with you on matters related to the Engagement by e-mail on an unencrypted basis.

You agree that the Firm may dispose of all files and records in its possession or under its control pertaining to this Engagement at any time more than five (5) years after the Firm last performs services related to the Engagement. Such disposal will be accomplished in a manner that will protect the confidentiality of such disposed files and records. You have the right to request, at any time before disposal of files, copies of any such files and records. You recognize and agree

352134-1

Salveson
Change of Heart
March 2, 2017
P a g e | 3

that the Firm may, at any time, discard documents, such as interim drafts and duplicates, which the Firm believes are not material to the protection of the Client's interests.

During the course of the Engagement, we may receive and produce documents related to you, the businesses of other parties involved, and otherwise in connection with the Engagement. Unless you direct us otherwise in writing, we plan to retain our files concerning the Engagement, to the extent provided in accordance with the preceding sentence, for a period of no less than five (5) years after the conclusion of the Engagement.

In any event, you may not, without our prior written consent, use written advice that we provide to you to promote, market or recommend to another party any transaction or tax-related matter. We anticipate a mutually satisfactory relationship. You, however, have the right to terminate the Firm's services upon written notice at any time. The Firm also has the right to terminate its services to you, upon written notice, in the event that any bill is not paid in full as submitted (*i.e.*, within 30 days). The Firm also has the right to terminate its services to you if you have misrepresented or failed to disclose material facts to us, you fail to cooperate with a reasonable request, or if the Firm determines, in its sole discretion, that continuing to provide services to you would create a conflict of interest or be unethical, impractical, improper or otherwise inappropriate. The total outstanding amount plus any additional charges for legal services and other client charges incurred through the effective date of withdrawal and thereafter in responding to requests from you or other attorneys representing you will be immediately due and payable upon termination of our representation. In the event of any termination of our services prior to our completion of our engagement as defined herein, we will refund any unearned retainer amount to the extent not earned by the Firm determined on a percentage completion basis.

We remind you that, in order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone who is not within the protection of the privilege.

If the foregoing meets with your approval, please print, sign and date this letter where indicated and return it to my attention. For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile or e-mail shall be treated in all manner and respects, and have the same force and effect, as an original document. Please keep a signed copy of this letter for your files.

352134-1

Salveson
Change of Heart
March 2, 2017
P a g e | 4

Should we work on other projects for you, we will provide an addendum to this Agreement.

We look forward to working with you.

Sincerely,

HAL "CORKY" KESSLER
kessler@dlec.com

HCK:cc

**ACCEPTED and AGREED:**

this _____ day of ___3 / 3___, 2017

KENT SALVESON and EMILY HUNTER
SALVESON

By: _____

EARL A. DEUTSCH (1924-2010)
PAUL M. LEVY (RETIRED 2014)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
KENNETH W. FUNK
PHILLIP J. ZISOOK
JOEL A. STEIN
KAREN KAVANAGH MACK
DENNIS E. FRISBY
BRIAN D. SAUCIER
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
LAUREN LUKOFF

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED

SUITE 1700

225 WEST WASHINGTON STREET

CHICAGO, ILLINOIS 60606

———

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1859

JENNIFER ROJAS
ALENA JOTKUS

———

COUNSEL
ALVIN J. HELFGOT
MARSHALL D. KROLICK
MELVYN H. BERKS

March 2, 2017

**Via E-Mail**

Kent Salveson and Emily Hunter Salveson
1600 Dove Street, Suite 315
Newport Beach, CA 92660

RE:   Draft LLC documents for Feature Film currently titled "Come Home"

Dear Kent and Emily:

We are pleased to have the opportunity to be of service to you (the "Client").  We look forward to working with you and will do our best to provide the highest quality business services to you in a responsive, efficient manner.

Fundamental to a sound relationship is a clear understanding of the terms and conditions upon which we will be providing legal services to you.  Accordingly, the purpose of this letter is to clarify and confirm these terms and conditions.

**Scope of Services**.

You asked that Deutsch, Levy & Engel, Chartered ("DLEC"), represent you in the following matters: Draft LLC documents for Feature Film currently titled "Come Home".

**Limitations on Obligation**.

The Client acknowledges that we are not the Client's general counsel and that our acceptance of this engagement does not involve an undertaking to represent the Client or its interests in any matter other than that described above. Furthermore, the Client acknowledges that our representation does not entail a continuing obligation to advise the Client concerning subsequent legal developments that might have a bearing on the Client's affairs generally or, after the completion of the matter as to which we are representing the Client, subsequent legal developments related to or that might have a bearing on that matter.  We may or may not hereafter undertake additional matters and services.  If we elect to do so, such additional matter and services will be memorialized by a supplemental written agreement to do so which will be an addendum to this Agreement.

Salveson
Come Home
March 2, 2017
P a g e | 2

The purpose of this letter is to provide the Client and our law firm (the "Firm") with a written memorandum of the terms and conditions under which the Firm will undertake to represent the Client in connection with the Engagement.

Any opinions or beliefs that we express about various courses of action and the result that might be anticipated are only our best professional estimates. They are necessarily limited by our knowledge of the facts at the time opinions are expressed and the law then in effect. No communications are to be construed as a promise or guarantee about the outcome of any matter, including the Engagement.

The Firm's billing procedures are designed to be as simple and clear as possible. Please ask me or our billing department any questions regarding each bill as soon as the Client receives it. Otherwise, we will assume that the bill is accepted as rendered. It is agreed that all rendered bills are payable on receipt. If a client's account is not paid in full on demand, we will have the right immediately to withdraw from representing the client. If a client's bill remains unpaid for more than thirty (30) days from the billing date, a service charge at an annualized rate of twelve percent (12%) is added to the unpaid balance.

We will send bills pertaining to our representation of the Client to you.

**Security Retainer For Fees and Charges.**

**Drafting of LLC Documents**

Based on the expected scope of services required for this Project, we will bill a flat fee for services of Three Thousand Dollars ($3,000.00). (*We acknowledge receipt of Three Thousand Dollars ($3,000.00) by Check (Check No. 1000) dated February 24, 2017.*) You agree to deposit this amount with us as a security retainer for such service fees in connection with our representation for the matter when you instruct us to commence this work. Fees will be held in our segregated general trust account and disbursed into our general operating account as and when the services described herein are rendered and/or costs are incurred. We will not expend time that will result in a bill in excess of this amount without your approval.

The Firm often communicates with clients through e-mail. A communication may relate to a particular matter or it may provide information about our Firm or legal matters that may be of general interest. You agree that the Firm may send you this material by electronic mail, among other means. You also agree that we may communicate with you on matters related to the Engagement by e-mail on an unencrypted basis.

You agree that the Firm may dispose of all files and records in its possession or under its control pertaining to this Engagement at any time more than five (5) years after the Firm last performs services related to the Engagement. Such disposal will be accomplished in a manner that will protect the confidentiality of such disposed files and records. You have the right to request, at any time before disposal of files, copies of any such files and records. You recognize and agree that the Firm may, at any time, discard documents, such as interim drafts and duplicates, which the Firm believes are not material to the protection of the Client's interests.

352134-1

Salveson
Come Home
March 2, 2017
P a g e | 3

During the course of the Engagement, we may receive and produce documents related to you, the businesses of other parties involved, and otherwise in connection with the Engagement. Unless you direct us otherwise in writing, we plan to retain our files concerning the Engagement, to the extent provided in accordance with the preceding sentence, for a period of no less than five (5) years after the conclusion of the Engagement.

In any event, you may not, without our prior written consent, use written advice that we provide to you to promote, market or recommend to another party any transaction or tax-related matter. We anticipate a mutually satisfactory relationship. You, however, have the right to terminate the Firm's services upon written notice at any time. The Firm also has the right to terminate its services to you, upon written notice, in the event that any bill is not paid in full as submitted (*i.e.*, within 30 days). The Firm also has the right to terminate its services to you if you have misrepresented or failed to disclose material facts to us, you fail to cooperate with a reasonable request, or if the Firm determines, in its sole discretion, that continuing to provide services to you would create a conflict of interest or be unethical, impractical, improper or otherwise inappropriate. The total outstanding amount plus any additional charges for legal services and other client charges incurred through the effective date of withdrawal and thereafter in responding to requests from you or other attorneys representing you will be immediately due and payable upon termination of our representation. In the event of any termination of our services prior to our completion of our engagement as defined herein, we will refund any unearned retainer amount to the extent not earned by the Firm determined on a percentage completion basis.

We remind you that, in order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone who is not within the protection of the privilege.

If the foregoing meets with your approval, please print, sign and date this letter where indicated and return it to my attention. For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile or e-mail shall be treated in all manner and respects, and have the same force and effect, as an original document. Please keep a signed copy of this letter for your files.

352134-1

Salveson
Come Home
March 2, 2017
P a g e | 4

Should we work on other projects for you, we will provide an addendum to this Agreement.

We look forward to working with you.

Sincerely,

HAL "CORKY" KESSLER
kessler@dlec.com

HCK:cc

**ACCEPTED and AGREED:**

this _____ day of _3_/_3_ , 2017

KENT SALVESON and EMILY HUNTER
SALVESON

By: _____

EARL A. DEUTSCH (1924-2010)
PAUL M. LEVY (RETIRED 2014)
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
KENNETH W. FUNK
PHILLIP J. ZISOOK
JOEL A. STEIN
KAREN KAVANAGH MACK
DENNIS E. FRISBY
BRIAN D. SAUCIER
MARGERY NEWMAN
JEFFREY B. HORWITZ
HAL "CORKY" KESSLER
LAUREN LUKOFF

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED

SUITE 1700

225 WEST WASHINGTON STREET

CHICAGO, ILLINOIS 60606

———

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1859

———

JENNIFER ROJAS
ALENA JOTKUS

———

COUNSEL
ALVIN J. HELFGOT
MARSHALL D. KROLICK
MELVYN H. BERKS

March 2, 2017

**Via E-Mail**

Kent Salveson and Emily Hunter Salveson
1600 Dove Street, Suite 315
Newport Beach, CA 92660

RE:   Draft LLC documents for Television Pilot and Television Episodic Series currently titled
      "Bath Time TV"

Dear Kent and Emily:

We are pleased to have the opportunity to be of service to you (the "Client"). We look forward
to working with you and will do our best to provide the highest quality business services to you
in a responsive, efficient manner.

Fundamental to a sound relationship is a clear understanding of the terms and conditions upon
which we will be providing legal services to you. Accordingly, the purpose of this letter is to
clarify and confirm these terms and conditions.

**Scope of Services**.

You asked that Deutsch, Levy & Engel, Chartered ("DLEC"), represent you in the following
matters: Draft LLC documents for Television Pilot and Television Episodic Series currently
titled "Bath Time TV".

**Limitations on Obligation**.

The Client acknowledges that we are not the Client's general counsel and that our acceptance of this
engagement does not involve an undertaking to represent the Client or its interests in any matter
other than that described above. Furthermore, the Client acknowledges that our representation does
not entail a continuing obligation to advise the Client concerning subsequent legal developments that
might have a bearing on the Client's affairs generally or, after the completion of the matter as to
which we are representing the Client, subsequent legal developments related to or that might have a
bearing on that matter. We may or may not hereafter undertake additional matters and services. If



Salveson
Bath Time TV
March 2, 2017
P a g e | 2

we elect to do so, such additional matter and services will be memorialized by a supplemental written agreement to do so which will be an addendum to this Agreement.

The purpose of this letter is to provide the Client and our law firm (the "Firm") with a written memorandum of the terms and conditions under which the Firm will undertake to represent the Client in connection with the Engagement.

Any opinions or beliefs that we express about various courses of action and the result that might be anticipated are only our best professional estimates. They are necessarily limited by our knowledge of the facts at the time opinions are expressed and the law then in effect. No communications are to be construed as a promise or guarantee about the outcome of any matter, including the Engagement.

The Firm's billing procedures are designed to be as simple and clear as possible. Please ask me or our billing department any questions regarding each bill as soon as the Client receives it. Otherwise, we will assume that the bill is accepted as rendered. It is agreed that all rendered bills are payable on receipt. If a client's account is not paid in full on demand, we will have the right immediately to withdraw from representing the client. If a client's bill remains unpaid for more than thirty (30) days from the billing date, a service charge at an annualized rate of twelve percent (12%) is added to the unpaid balance.

We will send bills pertaining to our representation of the Client to you.

**Security Retainer For Fees and Charges.**

**Drafting of LLC Documents**

Based on the expected scope of services required for this Project, we will bill a flat fee for services of Three Thousand Dollars ($3,000.00). (*We acknowledge receipt of Three Thousand Dollars ($3,000.00) by Check (Check No. 1000) dated February 24, 2017.*) You agree to deposit this amount with us as a security retainer for such service fees in connection with our representation for the matter when you instruct us to commence this work. Fees will be held in our segregated general trust account and disbursed into our general operating account as and when the services described herein are rendered and/or costs are incurred. We will not expend time that will result in a bill in excess of this amount without your approval.

The Firm often communicates with clients through e-mail. A communication may relate to a particular matter or it may provide information about our Firm or legal matters that may be of general interest. You agree that the Firm may send you this material by electronic mail, among other means. You also agree that we may communicate with you on matters related to the Engagement by e-mail on an unencrypted basis.

You agree that the Firm may dispose of all files and records in its possession or under its control pertaining to this Engagement at any time more than five (5) years after the Firm last performs services related to the Engagement. Such disposal will be accomplished in a manner that will protect the confidentiality of such disposed files and records. You have the right to request, at any time before disposal of files, copies of any such files and records. You recognize and agree

Salveson
Bath Time TV
March 2, 2017
P a g e | 3

that the Firm may, at any time, discard documents, such as interim drafts and duplicates, which the Firm believes are not material to the protection of the Client's interests.

During the course of the Engagement, we may receive and produce documents related to you, the businesses of other parties involved, and otherwise in connection with the Engagement. Unless you direct us otherwise in writing, we plan to retain our files concerning the Engagement, to the extent provided in accordance with the preceding sentence, for a period of no less than five (5) years after the conclusion of the Engagement.

In any event, you may not, without our prior written consent, use written advice that we provide to you to promote, market or recommend to another party any transaction or tax-related matter. We anticipate a mutually satisfactory relationship. You, however, have the right to terminate the Firm's services upon written notice at any time. The Firm also has the right to terminate its services to you, upon written notice, in the event that any bill is not paid in full as submitted (*i.e.,* within 30 days). The Firm also has the right to terminate its services to you if you have misrepresented or failed to disclose material facts to us, you fail to cooperate with a reasonable request, or if the Firm determines, in its sole discretion, that continuing to provide services to you would create a conflict of interest or be unethical, impractical, improper or otherwise inappropriate. The total outstanding amount plus any additional charges for legal services and other client charges incurred through the effective date of withdrawal and thereafter in responding to requests from you or other attorneys representing you will be immediately due and payable upon termination of our representation. In the event of any termination of our services prior to our completion of our engagement as defined herein, we will refund any unearned retainer amount to the extent not earned by the Firm determined on a percentage completion basis.

We remind you that, in order to protect the confidentiality of both your communications with us and our advice to you under the attorney-client privilege, please do not divulge them to, or discuss them with, anyone who is not within the protection of the privilege.

If the foregoing meets with your approval, please print, sign and date this letter where indicated and return it to my attention.  For purposes of finalizing this letter agreement, any signed document, including this letter, transmitted by facsimile or e-mail shall be treated in all manner and respects, and have the same force and effect, as an original document.  Please keep a signed copy of this letter for your files.

352134-1

Salveson
Bath Time TV
March 2, 2017
P a g e | 4

Should we work on other projects for you, we will provide an addendum to this Agreement.

We look forward to working with you.

Sincerely

HAL "CORKY" KESSLER
kessler@dlec.com

HCK:cc

**ACCEPTED and AGREED:**

this _____ day of _3/ 3_____, 2017

KENT SALVESON and EMILY HUNTER SALVESON

By: _____

352134-1

EXHIBIT B

Plus IconClick to expand the Mega Menu
Plus IconClick to Expand Search Input
VarietyPlus IconRead Next: Robinson Crusoe Inspired Animated Film 'The Island' Spins Off AR Exhibition, Board Game (EXCLUSIVE)
SUBSCRIBE
LOG IN

- **Film**
- **TV**
- **What To Watch**
- **Music**
- **Docs**
- **Tech**
- **Global**
- **Awards Circuit**
- **Video**
- **What To Hear**
- VIP



AP

1. Home
2. Film
3. News

# 'Rust' Producer's Key Adviser — Her Dad — Pushed Tax Shelters and Hid Income, IRS Says

**By**
**Gene Maddaus**

- 
- 
- 
- 
- 

For the last few years, Emily Salveson has been touting a new model for investing in film. In interviews and in public appearances, she has said that the model was able to "solve the problem of risk" for investors.

It's a pitch that's been heard before in the film industry, and it tends to end badly. But her company, Streamline Global, has nevertheless come from nowhere to help finance more than two dozen films in the last four years. She has done it thanks to provisions of the tax code that help wealthy clients defer their tax obligations.

"These massive tax cuts seem too good to be true," Streamline said on its website, "but they are battle-tested by the Silicon Valley elite, many of whom are Streamline clients."

One of her films was "Rust," the Alec Baldwin production that has been shut down since Oct. 21, when the actor fired a prop gun and killed cinematographer Halyna Hutchins. Salveson, an executive producer on the film, and her business partner, Ryan Donnell Smith, have each been sued for allegedly failing to ensure a safe set. The tragedy has brought intense scrutiny on all aspects of the production, including Salveson's proprietary financial model.

## Related Stories


VIP+

**What We Got Right (and Wrong) About Our 2021 Podcast Predictions**



**Howard Stern Urges Meat Loaf's Family to Speak Out on COVID Vaccine After His Death**

Financing films is hard, and even Oscar-winning producers and directors routinely struggle to scrounge up funding for their passion projects. So when someone appears to be raising money without breaking a sweat, it tends to raise eyebrows.

"Every few years somebody gets something that's too good to be true, and people think they've discovered a pot of gold," says Sky Moore, a veteran Hollywood attorney. "There's no way it makes sense."

Salveson is 36. As the Hollywood Reporter reported last month, she had a series of jobs before landing in film financing, including surf instructor, assistant at a rehab center, a job in the office of her father, tax attorney Kent Salveson, and host of a YouTube show called "Bath Time TV."



Emily Hunter Salveson Courtesy of Streamline Global Group Film

Kent Salveson, 71, is also a key figure in Streamline Global. He is formally identified as an adviser to the company, and ==he helped structure the company's financial model for film investment, according to an attorney who helped launch the firm.==

Salveson has also been accused by the IRS of promoting "abusive tax shelters," which allowed clients to claim excessive deductions and tax credits for solar panel projects. Salveson has disputed that characterization.

The IRS has also accused Kent Salveson of civil tax fraud for failing to report income in 2015 and 2016. The revenue service ordered Salveson to pay $2 million, including back taxes, interest, late fees, and almost $600,000 in fraud penalties. Salveson is disputing the allegations in U.S. Tax Court, and claims he may be entitled to a refund.

Kent Salveson has been working for more than 30 years in businesses that rely on tax-incentivized financing. In the early 1990s, Salveson launched EEXCEL (Educational Excellence for Children with Environmental Limitations), which leveraged government-backed loans to build affordable housing in South L.A. Salveson partnered with USC to offer tutoring programs, an idea that generated nationwide publicity. But the tutoring program was suspended within a couple of years due to a property tax dispute, according to [an L.A. Times report](#).

Salveson continued to work in real estate development. He filed for personal bankruptcy in 2003 and again in 2010, after his company, Campus Realty, collapsed and its homes were foreclosed upon. Salveson then turned to tax credits for renewable energy, launching Solar Energy Equities and Clear Sun Corp.

According to an IRS "explanation of items," Salveson's company would enter into a contract with a property owner, or a "host." The property owner would allow Salveson to install solar panels and agree to buy the power from Salveson's company at a discounted rate. Salveson would then sell the solar panel system to a client who needed a tax deduction.

The client would agree to a purchase price, and would agree to pay Salveson a 30% down payment. The client could use his or her federal tax credit – which also happened to be 30% – to cover the down payment. Salveson would consider the remaining 70% a loan, which would be slowly paid off as the host paid monthly power bills directly to Salveson.

The client had paid effectively nothing out of pocket, but could claim a tax deduction – spread over five years – worth 100% of the purchase price of the solar panels. At the end of five years, Salveson's company would take ownership of the panels.

In 2019, the IRS assessed a $9,000 penalty against Salveson for promoting this deal. The IRS agents alleged that Salveson dramatically inflated the value of the solar projects, sometimes by double or triple their true cost.

"Using Salveson's arrangement the customer/investor has no financial risk and in fact benefits from Salveson overvaluing the solar energy system," the IRS concluded. "The greater value that Salveson could assign to a system the greater the tax benefits and the better it was for both Salveson and the customer. This approach gave the customer no reason to question the value or cost of the solar energy systems as they were effectively out of the business deal in five years."

Salveson told agents that the total cost of materials, labor and permits for the panels was covered by the 30% down payment, according to the IRS document.

However, Salveson disputed the penalty, arguing that the solar projects were not overvalued.

"Taxpayer has not engaged in promotion of abusive tax shelters," he argued, saying the valuations were reasonable and supported by independent appraisals. "The claim is abusive and retaliatory in nature."

For support, Salveson pointed to an earlier tax court case, involving his clients Don and Sheila Golan. The Golans had acquired a solar project from Salveson in 2011 for a purported price of $300,000. But no money had changed hands. The transaction was financed with a $152,250 loan from Salveson, a deferred down payment, and a federal tax credit.

The Golans took a deduction for the investment. The IRS challenged it, and Salveson retained an attorney to defend them in tax court. The court reduced the Golans' deduction, but allowed them to claim the $152,250 in debt as a legitimate expense. The court also ruled that the IRS had not shown that the solar equipment was overvalued.

Salveson took that as vindication. On his own taxes for that year, he had claimed a $368,215 deduction for the cost of installing the solar equipment. The IRS had disallowed that as well, and one IRS lawyer described his use of tax credits and bonus depreciation for solar projects as "bullshit," according to a filing Salveson submitted in his bankruptcy case. After the Golan ruling in 2018, Salveson asked the bankruptcy court to reinstate his deduction. That motion was denied on procedural grounds.

The IRS imposed the $9,000 penalty for promoting abusive tax shelters the following year. The service cited four other Clear Sun clients, in addition to the Golans, who had also claimed inflated or improper credits and deductions. Salveson challenged the penalty in tax court, but the court dismissed his petition due to lack of jurisdiction.

Emily Salveson appeared on a panel at the Cannes Film Festival in July 2017, in which she touted her company's new model for film investment.

"Looking at the entertainment industry, I thought it was baffling to me that people were losing so much money so frequently by investing in films," she said. "So when I created this financial model, I thought, 'Is there a way to make it so that the profits of the film are not what define whether the investor makes money or not?'"

She credited a team of accountants and attorneys for helping her get the company off the ground, including attorney Hal "Corky" Kessler, who was moderating the panel. Kessler is an expert in Section 181, a tax incentive for film investment.

She did not cite her father. But according to Kessler, it was Kent Salveson who had hired him to draft some documents. Kessler told *Variety* that he spoke with the elder Salveson several times on the phone about how to adapt his tax incentive

model to the film business. He recalled Salveson saying that he "beat the IRS" in an earlier tax dispute.

Kessler also helped Emily Salveson get an interview with *Variety* and invited her to participate in the panel at Cannes, lending her credibility and career support. Kessler did several drafts of the documents, but ultimately Kent Salveson said he was dissatisfied with the work.

The whole experience left a sour taste, Kessler says.

"I did a lot of work, and he didn't like it," Kessler says.

Streamline's spokesperson, Sallie Hofmeister, did not dispute Kessler's account, but said that he "has violated his duty of confidentiality as an attorney and any statements by him should not be made public."

In addition to its work in the film business, Streamline also promoted investments in renewable energy and low-income housing. In her IMDb bio, Emily Salveson said that the company has a "strategic partnership with Clear Sun Corporation and EEXCEL Communities" – her father's companies. Hofmeister said that no Streamline clients have actually invested in those companies.

Kent Salveson has his own website – taxcreditattorney.com – which also touts investments in film, renewable energy, and low-income housing. His website contains language and graphics that match those found on Streamline's website nearly word-for-word.

On its website, Streamline states that it "works within the tax code."

"Nothing cannot be upheld in an audit," the company states. "Should an audit occur, Streamline works with taxpayer & CPA & Expert Counsel to defend the client."

Kent Salveson's site makes the same assurances, with one change: the word "Streamline" is replaced with "TCA" – for Tax Credit Attorney.

In a statement to *Variety*, Kent Salveson said that he has worked as an outside legal counsel for Streamline, but that his daughter deserves the credit for building the company.

"I wish I could take credit for Streamline's accomplishments, but I can't," he said. "This is all Emily. She may have learned about some of the tax concepts from

working with me, but this idea was hers, and she is the one who built the company. My role has been as outside legal counsel for Streamline and not for any of Streamline's investors. I am supportive but did not support her financially or provide capital to the business. I do not own any part of Streamline, nor am I an employee or officer. My motto has always been 'Do well by doing good,' so I am proud to see my daughter carrying on that tradition in the entertainment industry by increasing funds available to finance film projects."

In a separate statement, Emily Salveson said that she appreciates her father's mentorship.

"Addressing the needs of the film industry, and building a business that does that, is my passion," she said. "My father continues to mentor and inspire me every day and I appreciate all of his fatherly advice. I was determined to build a business of my own and, as a businesswoman in Hollywood, grow prouder of my team with every Streamline achievement."

They declined to address the allegations leveled by the IRS.

Todd Hein is an accountant who has worked closely with Streamline. He defends the company's model, saying it is a legitimate way for wealthy individuals to defer paying taxes.

"There is so much money lying around with wealthy people, and they're trying to find something to invest in," Hein says. "There are a lot of people that are very pro-tax deferral. This is pretty common with the self-made wealthy individuals. They earned it. They don't want to give it back. They're constantly looking for vehicles they can invest in that would give them some tax deferral."

Under Section 181, Streamline investors can write off the full cost of a film project as soon as a film goes into production. (Without that provision, they would have to wait to take the deduction until the film was actually distributed.) Congress created the incentive in 2004 as a way to keep film production from going overseas.

Just as with the solar energy investment, Streamline's film investment model relies heavily on debt. A Streamline client might agree to purchase a film for $1 million. They can pay just a fraction of that as a down payment – say, $100,000 – and personally guarantee a loan for the remaining $900,000. That guarantee might never be exercised, but it can still be used to take a deduction for the full $1 million.

Under a provision of the CARES Act – passed in 2020 to help alleviate the pandemic – taxpayers can also carry that deduction back up to five years. So an investor could wipe out tax liability for the current year and get a sizable refund for taxes paid in prior years.

Hein says that once a project starts generating revenue, that income will be used to pay down the guarantee, and it will be taxable. But that might take a while. In the meantime, the investor will have enjoyed the use of their other income without paying taxes on it.

"There's no magical way to not pay tax when the chickens come home to roost," Hein says. "It's a pure deferral play."

Emily Salveson has said that some investors are so pleased that they invest again – meaning they could repeatedly defer their tax obligations.

"Usually they come back many times after the first time," she said in an interview in June 2020.

Postponing taxation can be valuable, says another attorney who has worked for Streamline investors. "There's a general adage," he says, "as long as there's inflation, tax deferred is tax forgiven."

But others are skeptical that the model makes much sense for investors, at least in the way that it's advertised. Warren Goz is a film producer who made use of Section 181 when he ran Grand Army Entertainment, which launched in 2006 and shut down amid the credit crisis a few years later.

"I'm very skeptical when people are promoting an investment in film based on 181," Goz says, noting that investors might be able to write off their stake initially, but will end up owing tax sooner or later. "Whatever income comes through in that asset, you've got zero basis in it. You're going to be taxed on every single bit of that."

As a film production incentive, Goz says that Section 181 "is really not a difference maker at all."

In theory at least, the same drawback applied to the solar energy investment model. Once the solar panels started generating revenue, that revenue would be taxable income for the investor. And once Kent Salveson bought back the solar project after five years – either for a purchase price or by forgiving the balance of the debt – then that, too, would be taxable for the investor.

But the IRS alleged that Salveson did not tell investors that. In its 2019 explanation, the IRS stated that Salveson had "not fully considered the consequences to himself or the customers" of his taking ownership of the solar projects after five years.

"Nowhere in any of the provided documentation, on the website or in any interviews or meetings with Salveson has Salveson been able to show that he has let the customer/investor know that when they sell the system back to him it will have no basis which will result in a taxable gain to the customer," the IRS said. "Additionally, Salveson has not shown that he would properly account for receiving or repossessing a solar energy system by including the value of the system and the income stream in his (or his entities) income."

In other words, Salveson appeared to be far more diligent about claiming credits and deductions than he was about reporting income.

In April 2021, the IRS alleged that Salveson had failed to report $1.86 million of income in 2015 and 2016. The IRS also accused him of concealing and commingling assets, failing to keep adequate records, and failing to cooperate with its investigation. According to the IRS, Salveson had not filed his tax returns on time eight years in a row.

The IRS alleged that Salveson owed $794,000 in unpaid taxes for those two years, plus $595,000 in fraud penalties, $260,000 in delinquency penalties, and $339,000 in interest.

Salveson filed a tax court petition in June accusing the IRS of numerous errors, and seeking a tax refund. The IRS filed an answer in November, restating its earlier allegations and accusing Salveson of failing to substantiate hundreds of thousands of dollars in claimed deductions. The case remains pending.

It is not clear whether the IRS has investigated Streamline. The IRS declined to comment, citing the confidentiality of tax records.

The attorney who works with Streamline investors, who asked not to be identified, said that one of his clients had been audited, and the IRS approved the return with no change.

"You're digging in the wrong direction," the attorney says. "The tax benefit is just icing. These people want to be involved in films. They want to be around actors and the glamor of the film industry. They get tickets to the premiere. They hobnob with famous people. I think that's the primary motivation."

Hal "Corky" Kessler, an attorney who has worked extensively on Section 181 productions, helped Salveson get her start in the industry a few years ago. He said that those who are involved in financing are often not equipped to take on the role of a true producer, who is responsible for actively overseeing the production.

"This was a nightmare waiting to happen," Kessler said. "People who put money and have not had experience doing the jobs they have titles to should not do them. I don't know what she did or didn't do. I don't speak ill of her. But at the same time, the questions have to be asked. Why did they get rid of the union people? There is something strange about this whole thing."

EXHIBIT C

 Gmail

**Kent Salveson <kent1199@gmail.com>**

---

# I told you to have your father call my partner Jerry Rudman and discuss the fee

4 messages

---

**Corky Kessler** <kessler@dlec.com>                    Fri, Aug 4, 2017 at 4:50 AM
To: Emily Salveson <ehs@streamlineglobalgroup.com>
Cc: Kent Salveson <kent1199@gmail.com>

I said in conversation with all I needed to talk to my partners
I did
No agreement was reached as we did what was asked for.
I know your father did not like what we drafted but we did what we could under the
guidelines of 181. I respect your father greatly and I respect all he has accomplished. I

Offered to review what he drafted and comment.
You can discuss all with Jerry Rudman. He is one of my partners who helped greatly
with the drafting. He can be reached at 312 346 1460.
 Emily I spent many hours working on branding you. I would have been happy to
continue. I charged nothing for that time. I had you on panels and invited you to places
to should be at.
I wish all a great weekend.
Best
Corky


Sent from my iPhone

---

**Emily Salveson** <ehs@streamlineglobalgroup.com>          Fri, Aug 4, 2017 at 8:54 AM
To: Corky Kessler <kessler@dlec.com>
Cc: Kent Salveson <kent1199@gmail.com>, Josh Zabar <jz@streamlineglobalgroup.com>

You were told to cease and desist on the letter after you lost us 2 large deals that would
have been very helpful in, as you put it, "putting us on the map." Still you continued
writing despite Kent explicitly telling you to stop and to return all funds. Then you
involved Jerry Rudman, all the while misrepresenting to us that YOU were writing the
letter. We never engaged Jerry Rudman. I look for character and you have pawned off
this entire discussion to someone I have never even heard of. That's not okay. I could
have hired a publicist for a year for the $25k you were ordered to refund.

**Emily Salveson** <ehs@streamlineglobalgroup.com>          Fri, Aug 4, 2017 at 9:55 AM
To: Josh Zabar <jz@streamlineglobalgroup.com>, Kent Salveson <kent1199@gmail.com>
Cc: Corky Kessler <kessler@dlec.com>

Kent and Josh need to be copied in on all of this.


Begin forwarded message:


> **From:** Corky Kessler <kessler@dlec.com>
> **Date:** August 4, 2017 at 9:15:32 AM PDT
> **To:** Emily Salveson <ehs@streamlineglobalgroup.com>
> **Subject: Re: I told you to have your father call my partner Jerry Rudman and discuss the fee**
>
>
> I was not. Jerry is my
> Partner
>
> Sent from my iPhone
> [Quoted text hidden]

---

**Emily Salveson** <ehs@streamlineglobalgroup.com>          Fri, Aug 4, 2017 at 3:47 PM
To: Corky Kessler <kessler@dlec.com>
Cc: Josh Zabar <jz@streamlineglobalgroup.com>, Kent Salveson <kent1199@gmail.com>

If I had wanted an opinion letter from some random attorney who has zero recognition for 181 deals I would have hired one. But I didn't. Because that's not what we wanted, not what we paid for, and certainly not what were promised. Unbelievable.

> On Aug 4, 2017, at 9:15 AM, Corky Kessler <kessler@dlec.com> wrote:
>
> I was not. Jerry is my
> Partner
>
> Sent from my iPhone
>
>> On Aug 4, 2017, at 10:54 AM, Emily Salveson <ehs@streamlineglobalgroup.com> wrote:
>>

[Quoted text hidden]

 Gmail

**Kent Salveson <kent1199@gmail.com>**

---

# Re: i heard you hired another attorney
2 messages

---

**Emily Salveson** <ehs@streamlineglobalgroup.com>          Thu, Aug 3, 2017 at 11:59 PM
To: Kent Salveson <kent1199@gmail.com>
Cc: Josh Zabar <jz@streamlineglobalgroup.com>, Corky Kessler <kessler@dlec.com>

Hi Dad,

Corky has still has not returned the $25k for the opinion letter you ordered a cease and desist on that he continued to work on despite your demand of a refund. I doubt the other attorney would have continued to work on it if he knew a cease and desist had been ordered. Oh, and he says he "put me on the map" as if that is a reason to not do legal work he was paid to do. Would you like to handle this?

Best,

Emily

On Aug 3, 2017, at 11:53 PM, Emily Salveson <ehs@streamlineglobalgroup.com> wrote:

> And yet you still have not returned the funds Kent ordered a cease and desist and refund for?? I fought for you for a long time Corky but I will handle this if I have to. I have been nothing but gracious, and you send me bravado and threats? Are you sure that's how you want to treat me?
>
> On Aug 2, 2017, at 11:17 AM, Corky Kessler <kessler@dlec.com> wrote:
>
>> # It was fun and interesting while I represented you both
>>
>> # I want both of you to know I but Emily on the map

**Having said that I hear you told some of my clients that I am not representing you anymore. It is something I could have told them**

**Good luck with all**

---

**CORKY KESSLER**

225 W. WASHINGTON ST., SUITE 1700

CHICAGO, ILLINOIS 60606

312-346-1460 (v)  |  312-853-8487 (f) 312 -925 -2110( cell)
Kessler@dlec.com

| DL&E | DEUTSCH, LEVY & ENGEL, CHARTERED |
|------|----------------------------------|

---

Any written statement or tax advice contained herein (including any attachments) (1) is not intended to be used (and cannot be so used) by any taxpayer or other person for the purpose of avoiding any penalties that may be imposed under the Internal Revenue Code, and (2) may not be used by any person to support the promotion or marketing of or to recommend any Federal tax transaction or matter addressed in this communication (including any attachments). No one, without our express prior written permission, may use any part of this communication (attachments) in promoting, marketing or recommending an arrangement relating to any Federal tax matter to one or more taxpayers. Furthermore, this communication (attachments) may not be shared with any other person without our prior written consent other than as required by

law or by ethical rules. This prohibition on sharing this communication (attachments) does not preclude you from sharing with others the nature of this transaction or the fact that you consummated it.

*****************************************************************

Information contained in this E-Mail transmission is privileged and confidential. If you are not the intended recipient, please do not read, distribute, or reproduce this transmission.  If you have received this E-Mail transmission in error, please call Deutsch, Levy & Engel at 312/346-1460. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus-free and no responsibility is accepted by Deutsch, Levy & Engel, Chartered for any loss or damage arising in any way from its use. Thank you.

---

**Emily Salveson** <ehs@streamlineglobalgroup.com>          Fri, Aug 4, 2017 at 1:13 AM
To: Kent Salveson <kent1199@gmail.com>
Cc: Corky Kessler <kessler@dlec.com>

Dad, I recall that Corky's failure to produce a letter we paid for anywhere near within the time frame he promised it cost us a very large deal (or was it two large deals?) that would have been helpful in "putting us on the map."

[Quoted text hidden]

# M Gmail

## RE: Conversation with Todd Hein
35 messages

---

**Kent Salveson** <kent1199@gmail.com>                                    Fri, Dec 24, 2021 at 2:30 PM
To: HAL KESSLER <corkykessler@aim.com>, Emily Salveson <ehs@streamlineglobal.com>

Dear Mr. Kessler;

As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am **NOW** requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

Kent Salveson

---

**Emily Salveson** <ehs@streamlineglobal.com>                                    Fri, Dec 24, 2021 at 2:32 PM
Reply-To: ehs@streamlineglobal.com
To: Aaron Dyer <aaron.dyer@pillsburylaw.com>, Kent Salveson <kent1199@gmail.com>, Mike Sitrick <Mike_Sitrick@sitrick.com>, Ryan Smith <rs@streamlineglobal.com>, Sallie Hofmeister <shofmeister@sitrick.com>, "Spadone, Melina" <melina.spadone@pillsburylaw.com>

---------- Forwarded message ---------
From: **Kent Salveson** <kent1199@gmail.com>
Date: Fri, Dec 24, 2021 at 2:30 PM
Subject: RE: Conversation with Todd Hein
To: HAL KESSLER <corkykessler@aim.com>, Emily Salveson <ehs@streamlineglobal.com>

Dear Mr. Kessler;

As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am **NOW**  requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

_____
Emily Hunter Salveson
CEO & Founder
StreamlineGlobal.com
Direct Dial: +1 (949) 291-7391
ehs@streamlineglobal.com

------------------------------------------------------------
DISCLOSURE: Streamline Global Group and its affiliates do not provide tax, legal, or accounting advice. The material in this email has been prepared for informational purposes only and is not intended to provide, and should not be relied on for tax, legal, or accounting advice. You should consult your own tax, legal and accounting advisors before engaging in any transaction.

---

**HAL KESSLER** <corkykessler@aim.com>                                          Fri, Dec 24, 2021 at 2:40 PM
To: Kent Salveson <kent1199@gmail.com>

All I said is that you hired me and did not like me work. All else was done by variety.
I did nothing more and would not. I talked to todd only as he saw it too.
Have your atty call me Monday.
I will talk to him or her
Merry Christmas

Sent from my iPhone

> On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:
>
>
> Dear Mr. Kessler;
>
> As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am **NOW** requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.
>
> *As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*
>
> *Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*
>
> Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                                          Fri, Dec 24, 2021 at 2:42 PM
To: Kent Salveson <kent1199@gmail.com>

No others.
Just this
It is not malpractice
Have your atty call Monday

No other talks.

Sent from my iPhone


On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:


All I said is that you hired me and did not like me work. All else was done by variety.
I did nothing more and would not. I talked to todd only as he saw it too.
Have your atty call me Monday.
I will talk to him or her
Merry Christmas

Sent from my iPhone


On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:


Dear Mr. Kessler;

As stated in your email *you were my attorney* and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "*why did you defend Streamline ?* "   Consequently, as part of the production of  documents previously demanded; I am *NOW*  requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                                                          Fri, Dec 24, 2021 at 2:43 PM
To: Kent Salveson <kent1199@gmail.com>

No conversations about you to todd. Only if he represented you still


Sent from my iPhone

On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:


All I said is that you hired me and did not like me work. All else was done by variety.
I did nothing more and would not. I talked to todd only as he saw it too.
Have your atty call me Monday.
I will talk to him or her
Merry Christmas

Sent from my iPhone

*"why did you defend Streamline ?"*  Consequently, as part of my request to you for documents, I reviewed my prior email requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                                           Fri, Dec 24, 2021 at 6:50 PM
To: Kent Salveson <kent1199@gmail.com>

I only stated you hired me and did not like the work I did. I never disclosed or breached client information and all will come out. If you prepare something for to sign and all is correct and I sign you can think about going after them. I empathized to the reporter that I did not ever know of your background in any shape.  I had no knowledge of that.  I did state I helped Emily when she started and also helped her in Cannes.  All is true. I got the variety article for her.  I am not your enemy

Sent from my iPhone

> On Dec 24, 2021, at 8:38 PM, HAL KESSLER <corkykessler@aim.com> wrote:
>
> Kent.
> The only statements I gave them is that you hired me and did not like my work. No other statements given.  No statements to Todd either.
> Variety did it own research and nothing else came from me.  If you decide to do so please understand that you do not know the whole story.  I know your frustration. I am the wrong enemy.
> Please have your attorney call me next week
> Merry Christmas
>
> Sent from my iPhone
>
>> On Dec 24, 2021, at 7:09 PM, Kent Salveson <kent1199@gmail.com> wrote:
>>
>> Mr. Kessler;
>>
>> Variety Magazine has quoted your statements which are absolutely false and clearly damaging to me  throughout the entire variety article.  There is no point for me, at this time, to talk to variety since they claim to have quoted you and will continue to do so.  They are going to rely on attributing your statements to you to avoid liability.   Given that I did not speak to Variety (gene maddeus) or any other reporter because that is always an attorney-client issue and cannot be disclosed, I know that I am not the source of any information.

Consequently, based on your statements to me, the facts are either (1) you did speak to Variety and made comments or opinion; comment or confirmed comments as it pertains to streamline and myself; or in the alternative, Variety has lied and falsely reported comments by attributing various statements and quotes to you that you claim you did not make; and that Variety has thereby damaged you, as well as myself.   If (1) is correct then I will proceed vigorously against you.  If (2) is correct, then you will need to immediately prepare a complete and unambiguous declaration, signed under penalty of perjury, denying that you made the comments reportedly attributed to you and that Variety has made or attributed false statements to you which you now disavow.    If a declaration is prepared, you need to know that it will be the source document used in a lawsuit against Variety.

I need to know what is true and what is not in the next 24 hours because I am moving forward with a complaint.

Kent Salveson

On Fri, Dec 24, 2021 at 2:47 PM HAL KESSLER <corkykessler@aim.com> wrote:
> Ask variety.
> Why not ask them.
> Mine was simply I represented you
>
> Sent from my iPhone
>
>> On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:
>>
>> All I said is that you hired me and did not like me work. All else was done by variety.
>> I did nothing more and would not. I talked to todd only as he saw it too.
>> Have your atty call me Monday.
>> I will talk to him or her
>> Merry Christmas
>>
>> Sent from my iPhone
>>
>>> On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:
>>>
>>>
>>> Dear Mr. Kessler;
>>>
>>> As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and as part of that conversation you made a statement to the effect asking Todd **"why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am *NOW* requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.
>>>
>>> *As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the*
Case 8:22-cv-00314-CJC-ADS Document 1 Filed 02/26/22   Page 71 of 85   Page ID #:71
~~3 Documents~~ ~~Wednesday~~ ~~500.pn~~
Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                                    Fri, Dec 24, 2021 at 6:50 PM
To: Kent Salveson <kent1199@gmail.com>

I will disavow any untrue statements

Sent from my iPhone

> On Dec 24, 2021, at 8:38 PM, HAL KESSLER <corkykessler@aim.com> wrote:
>
> Kent.
> The only statements I gave them is that you hired me and did not like my work. No other statements given.  No statements to Todd either.
> Variety did it own research and nothing else came from me.  If you decide to do so please understand that you do not know the whole story.  I know your frustration. I am the wrong enemy.
> Please have your attorney call me next week
> Merry Christmas
>
>
> Sent from my iPhone
>
>> On Dec 24, 2021, at 7:09 PM, Kent Salveson <kent1199@gmail.com> wrote:
>>
>>
>> Mr. Kessler;
>>
>> Variety Magazine has quoted your statements which are absolutely false and clearly damaging to me  throughout the entire variety article.  There is no point for me, at this time, to talk to variety since they claim to have quoted you and will continue to do so.  They are going to rely on attributing your statements to you to avoid liability.  Given that I did not speak to Variety (gene maddeus) or any other reporter because that is always an attorney-client issue and cannot be disclosed, I know that I am not the source of any information.
>>
>> Consequently, based on your statements to me, the facts are either (1) you did speak to Variety and are now lying in an effort to cover up your comments and your breach of fiduciary duty; or (2) in the alternative, Variety has lied and falsely reported comments by attributing various statements and quotes to you that you claim you did not make; and that Variety has thereby damaged you, as well as myself.   If (1) is correct then I will proceed vigorously against you.  If (2) is correct, then you will need to immediately prepare a complete and unambiguous declaration, signed under penalty of perjury, denying that you made the comments reportedly attributed to you and that Variety has made or attributed false statements to you which you now disavow.    If a declaration is prepared, you need to know that it will be the source document used in a lawsuit against Variety.
>>
>> I need to know what is true and what is not in the next 24 hours because I am moving forward with a complaint.
>>
>> Kent Salveson
>>
>> On Fri, Dec 24, 2021 at 2:47 PM HAL KESSLER <corkykessler@aim.com> wrote:
>>> Ask variety.
>>> Why not ask them.
>>> Mine was simply I represented you
>>>
>>> Sent from my iPhone

On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:

All I said is that you hired me and did not like me work. All else was done by variety.
I did nothing more and would not. I talked to todd only as he saw it too.
Have your atty call me Monday.
I will talk to him or her
Merry Christmas

Sent from my iPhone

On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:

Dear Mr. Kessler;

As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am **NOW** requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                              Fri, Dec 24, 2021 at 6:56 PM
To: Kent Salveson <kent1199@gmail.com>

I knew nothing about IRS or any of your business issues stated. I told him I know nothing. He asked me

Sent from my iPhone

On Dec 24, 2021, at 8:38 PM, HAL KESSLER <corkykessler@aim.com> wrote:

Kent.
The only statements I gave them is that you hired me and did not like my work. No other statements given.  No statements to Todd either.
Variety did it own research and nothing else came from me.  If you decide to do so please understand that you do not know the whole story.  I know your frustration. I am the wrong enemy.

Please have your attorney call me next week

Sent from my iPhone

On Dec 24, 2021, at 7:09 PM, Kent Salveson <kent1199@gmail.com> wrote:

Mr. Kessler;

Variety Magazine has quoted your statements which are absolutely false and clearly damaging to me  throughout the entire variety article.  There is no point for me, at this time, to talk to variety since they claim to have quoted you and will continue to do so.  They are going to rely on attributing your statements to you to avoid liability.   Given that I did not speak to Variety (gene maddeus) or any other reporter because that is always an attorney-client issue and cannot be disclosed, I know that I am not the source of any information.

Consequently, based on your statements to me, the facts are either (1) you did speak to Variety and are now lying in an effort to cover up your comments and your breach of fiduciary duty; or (2) in the alternative, Variety has lied and falsely reported comments by attributing various statements and quotes to you that you claim you did not make; and that Variety has thereby damaged you, as well as myself.   If (1) is correct then I will proceed vigorously against you.  If (2) is correct, then you will need to immediately prepare a complete and unambiguous declaration, signed under penalty of perjury, denying that you made the comments reportedly attributed to you and that Variety has made or attributed false statements to you which you now disavow.    If a declaration is prepared, you need to know that it will be the source document used in a lawsuit against Variety.

I need to know what is true and what is not in the next 24 hours because I am moving forward with a complaint.

Kent Salveson

On Fri, Dec 24, 2021 at 2:47 PM HAL KESSLER <corkykessler@aim.com> wrote:
> Ask variety.
> Why not ask them.
> Mine was simply I represented you
>
> Sent from my iPhone
>
>
>         On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:
>
>         All I said is that you hired me and did not like me work. All else was done by variety.
>         I did nothing more and would not. I talked to todd only as he saw it too.
>         Have your atty call me Monday.
>         I will talk to him or her
>         Merry Christmas
>
>         Sent from my iPhone
>
>
>                 On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:
>
>
>                 Dear Mr. Kessler;
>
>                 As stated in your email *you were my attorney* and I have an absolute right to attorney client privilege.  It has now come to my

attention that you made a call to Todd Hein this morning and as part
"*why did you defend Streamline ?* " Consequently, as part of
the production of documents previously demanded; I am ***NOW***
requesting that you provide me with **(1)** either a transcript or
summary of your conversation with Todd, and **(2)** an explanation as
to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney
and that I have requested copies of all my documents in preparation
for a lawsuit against you for malpractice, breach of fiduciary duty,
breach of contract and negligence. I requested that you produce a
copy of my retainer agreement, copy of all legal fees charged, copy
of the opinion letter produced by you, description of services, copy of
all correspondence between you and myself and/or streamline, a
transcript or summary of your conversation with any reporter or other
person from Variety Magazine and any other conversations that you
have had with other reporters from The Hollywood Reporter
Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the
documents by Wednesday 5:00 pm.*

Kent Salveson

---

**HAL KESSLER** <corkykessler@aim.com>                                  Fri, Dec 24, 2021 at 6:58 PM
To: Kent Salveson <kent1199@gmail.com>

Finally i said nothing to Todd about and your claim I did is false.

Sent from my iPhone

> On Dec 24, 2021, at 8:38 PM, HAL KESSLER <corkykessler@aim.com> wrote:
>
> Kent.
> The only statements I gave them is that you hired me and did not like my work. No other statements given. No
> statements to Todd either.
> Variety did it own research and nothing else came from me. If you decide to do so please understand that you do
> not know the whole story. I know your frustration. I am the wrong enemy.
> Please have your attorney call me next week
> Merry Christmas
>
> Sent from my iPhone
>
>> On Dec 24, 2021, at 7:09 PM, Kent Salveson <kent1199@gmail.com> wrote:
>>
>>
>> Mr. Kessler;
>>
>> Variety Magazine has quoted your statements which are absolutely false and clearly damaging to
>> me throughout the entire variety article. There is no point for me, at this time, to talk to variety
>> since they claim to have quoted you and will continue to do so. They are going to rely on attributing
>> your statements to you to avoid liability. Given that I did not speak to Variety (gene maddeus) or
>> any other reporter because that is always an attorney-client issue and cannot be disclosed, I know
>> that I am not the source of any information.
>>
>> Consequently, based on your statements to me, the facts are either (1) you did speak to Variety
>> and are now lying in an effort to cover up your comments and your breach of fiduciary duty; or (2) in

the alternative, Variety has lied and falsely reported comments by attributing various statements to my prior attorney, HAL KESSLER. You need to make a decision here. Did you do (1) or (2) as well as myself.   If (1) is correct then I will proceed vigorously against you.  If (2) is correct, then you will need to immediately prepare a complete and unambiguous declaration, signed under penalty of perjury, denying that you made the comments reportedly attributed to you and that Variety has made or attributed false statements to you which you now disavow.     If a declaration is prepared, you need to know that it will be the source document used in a lawsuit against Variety.

I need to know what is true and what is not in the next 24 hours because I am moving forward with a complaint.

Kent Salveson

On Fri, Dec 24, 2021 at 2:47 PM HAL KESSLER <corkykessler@aim.com> wrote:
> Ask variety.
> Why not ask them.
> Mine was simply I represented you
>
> Sent from my iPhone
>
>
> > On Dec 24, 2021, at 4:40 PM, HAL KESSLER <corkykessler@aim.com> wrote:
> >
> >
> > All I said is that you hired me and did not like me work. All else was done by variety.
> > I did nothing more and would not. I talked to todd only as he saw it too.
> > Have your atty call me Monday.
> > I will talk to him or her
> > Merry Christmas
> >
> > Sent from my iPhone
> >
> >
> > > On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:
> > >
> > >
> > >
> > > Dear Mr. Kessler;
> > >
> > > As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege.  It has now come to my attention that you made a call to Todd Hein this morning and  as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** "   Consequently, as part of the production of  documents previously demanded; I am **NOW** requesting that you provide me with **(1)** either a transcript or summary of your conversation  with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.
> > >
> > >
> > > *As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence.  I requested  that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*
> > >
> > > *Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

**Kent Salveson** <kent1199@gmail.com>                                    Fri, Dec 24, 2021 at 8:43 PM
To: HAL KESSLER <corkykessler@aim.com>, Emily Salveson <ehs@streamlineglobal.com>

Dear Mr. Kessler;

Based on my prior email, you have two options: (1) you lied and breached your duty as described and I proceed; or option (2) based on your denials Variety lied and you provide a declaration in support.

Kent Salveson


On Fri, Dec 24, 2021 at 6:38 PM HAL KESSLER <corkykessler@aim.com> wrote:
> Kent.
> The only statements I gave them is that you hired me and did not like my work. No other statements given.  No statements to Todd either.
> Variety did it own research and nothing else came from me.  If you decide to do so please understand that you do not know the whole story.  I know your frustration. I am the wrong enemy.
> Please have your attorney call me next week
> Merry Christmas
>
> Sent from my iPhone
>
>> On Dec 24, 2021, at 7:09 PM, Kent Salveson <kent1199@gmail.com> wrote:
>>
>>
>> Mr. Kessler;
>>
>> Variety Magazine has quoted your statements which are absolutely false and clearly damaging to me throughout the entire variety article.  There is no point for me, at this time, to talk to variety since they claim to have quoted you and will continue to do so.  They are going to rely on attributing your statements to you to avoid liability.   Given that I did not speak to Variety (gene maddeus) or any other reporter because that is always an attorney-client issue and cannot be disclosed, I know that I am not the source of any information.
>>
>> Consequently, based on your statements to me, the facts are either (1) you did speak to Variety and are now lying in an effort to cover up your comments and your breach of fiduciary duty; or (2) in the alternative, Variety has lied and falsely reported comments by attributing various statements and quotes to you that you claim you did not make; and that Variety has thereby damaged you, as well as myself.   If (1) is correct then I will proceed vigorously against you.  If (2) is correct, then you will need to immediately prepare a complete and unambiguous declaration, signed under penalty of perjury, denying that you made the comments reportedly attributed to you and that Variety has made or attributed false statements to you which you now disavow.    If a declaration is prepared, you need to know that it will be the source document used in a lawsuit against Variety.
>>
>> I need to know what is true and what is not in the next 24 hours because I am moving forward with a complaint.
>>
>> Kent Salveson
>>
>> On Fri, Dec 24, 2021 at 2:47 PM HAL KESSLER <corkykessler@aim.com> wrote:
>>> Ask variety.
>>> Why not ask them.
>>> Mine was simply I represented you
>>>
>>> Sent from my iPhone

All I said is that you hired me and did not like me work. All else was done by variety.
I did nothing more and would not. I talked to todd only as he saw it too.
Have your atty call me Monday.
I will talk to him or her
Merry Christmas

Sent from my iPhone

> On Dec 24, 2021, at 4:30 PM, Kent Salveson <kent1199@gmail.com> wrote:

Dear Mr. Kessler;

As stated in your email **you were my attorney** and I have an absolute right to attorney client privilege. It has now come to my attention that you made a call to Todd Hein this morning and as part of that conversation you made a statement to the effect asking Todd "**why did you defend Streamline ?** " Consequently, as part of the production of documents previously demanded; I am *NOW* requesting that you provide me with **(1)** either a transcript or summary of your conversation with Todd, and **(2)** an explanation as to why you would make an unsolicited phone call to Todd about me.

*As a reminder, in my prior email, I stated that you were my attorney and that I have requested copies of all my documents in preparation for a lawsuit against you for malpractice, breach of fiduciary duty, breach of contract and negligence. I requested that you produce a copy of my retainer agreement, copy of all legal fees charged, copy of the opinion letter produced by you, description of services, copy of all correspondence between you and myself and/or streamline, a transcript or summary of your conversation with any reporter or other person from Variety Magazine and any other conversations that you have had with other reporters from The Hollywood Reporter Magazine or any other publication.*

*Giving an allowance for the holidays, I expect delivery of the documents by Wednesday 5:00 pm.*

Kent Salveson

---

**Emily Salveson** <ehs@streamlineglobal.com>                                Fri, Dec 24, 2021 at 8:51 PM
Reply-To: ehs@streamlineglobal.com
To: Aaron Dyer <aaron.dyer@pillsburylaw.com>, Kent Salveson <kent1199@gmail.com>, Mike Sitrick <Mike_Sitrick@sitrick.com>, Ryan Smith <rs@streamlineglobal.com>, Sallie Hofmeister <shofmeister@sitrick.com>, "Spadone, Melina" <melina.spadone@pillsburylaw.com>

---------- Forwarded message ---------
From: **Kent Salveson** <kent1199@gmail.com>
Date: Fri, Dec 24, 2021 at 8:43 PM
Subject: Re: Conversation with Todd Hein
To: HAL KESSLER <corkykessler@aim.com>, Emily Salveson <ehs@streamlineglobal.com>

Dear Mr. Kessler;

Based on my prior email, you have two options: (1) you lied and breached your duty as described and I proceed; or option (2) based on your denials Variety lied and you provide a declaration in support.

Kent Salveson

EXHIBIT D

4/25/2017

**DRAFT ONLY**
**FOR REVIEW**
**SUBJECT TO FURTHER**
**MODIFICATION**
**PRIOR TO ISSUANCE**
**OF FINAL VERSION**
**UPON REVIEW OF ALL**
**FINAL DOCUMENTS**
**BETWEEN K2 AND**
**PLANTATION VILLAGE**
**STUDIOS RELATING TO**
**ACQUISITION OF PILOT**

April ____, 2017

K2 Energy Finance Group, LLC
1600 Dove Street, 315
Newport Beach, California 92660

> Re: *Limouseen Luxury Transportation Pilot –*
> *Section 181 Eligibility, Qualified Opinion*

Ladies and Gentlemen:

You have advised us that K2 Energy Finance Group, LLC ("K2" or the "Company") is purchasing the Pilot episode entitled "Limouseen Luxury Transportation" (the "Pilot") of a teleplay for a television series entitled "Pini USA," including all work in process, and contracts in place, and intellectual property relating to said Pilot only (the "Transaction"). K2 has requested that Deutsch, Levy & Engel Chartered ("DLEC") provide an opinion (the "Opinion"), as of the date hereof, as to whether the Pilot qualifies under Internal Revenue Code Section 181 of the American Jobs Creation Act of 2004, as amended and extended, so as to allow K2 to claim the purchase cost and future qualified production costs paid by K2 to complete the Pilot as a deduction in the year or years spent by K2.

DLEC has been retained by K2 to provide this Opinion and will be compensated by K2. As you know, DLEC has previously provided services to Pini USA, LLC ("Pini") and Plantation Village Studios, LLC ("Village Studios"). K2 and Village Studios have each executed a waiver conflict of interest letter waiving any potential conflict of interest that may exist and consenting to DLEC issuing this Opinion.

463126_11

K2 Energy Finance Group, LLC
April _____, 2017
Page 2

In connection with this Opinion, we have examined originals or copies of the documents provided to us by K2 and/or Village Studios for the purpose of rendering this Opinion (collectively the "Documents"), including the following:

(i)     The 2014 federal income tax return of Village Studios prepared by the accounting firm Crowe Horwath, LLP which purportedly includes the making of the Section 181 election for the production, naming Pini USA, LLC;

(ii)    The 2015 federal income tax return of Village Studios.  We are advised that the 2016 federal income tax return of Village Studios has not yet been filed.

(iii)   The Articles of Organization of Village Studios, filed with the Louisiana Secretary State, dated September 27, 2013;

(iv)    A certificate of good standing from the Secretary of State of Louisiana certifying that Village Studios is in good standing as of April 21, 2017;

(v)     The Summary Budget of Limousine/Pini USA (Producer – Village Studios), dated July 20, 2014;

(vi)    A copy of the teleplay for the Pilot;

(vii)   We have been furnished with a YouTube connection purporting to show one day of completed photography of one (1) minute twenty-four (24) seconds in duration; and

(viii)  The Articles of Organization of Pini USA, LLC, filed with the Louisiana Secretary of State, dated October 29, 2014.

In addition, we have reviewed such matters of law as we have deemed appropriate as a basis for the Opinion expressed herein, including but not limited to, Section 181 of the Internal Revenue Code (the "Code") and the Rules and Regulations promulgated thereunder.

In rendering the Opinion set forth herein, we have assumed, without independent investigation, the authenticity and completeness of all Documents provided to us as originals, and the conformity with the originals of all Documents provided to us as copies, including any hard copies or electronically transmitted copies. We have also assumed without further investigation that all Documents have been duly filed, authorized and executed. This Opinion is based on our assumption of the truthfulness, accuracy, and completeness of all Documents, as well as of the factual statements contained within such Documents. Additionally, this Opinion specifically incorporates herein the *Legal Opinion Accord*, included in the *Third-Party Legal Opinion Report*, published by the Section of Business Law of the American Bar Association, 47 BUS. LAW. 167 (1991).

K2 Energy Finance Group, LLC
April _____, 2017
Page 3

As to any facts material to this Opinion which we did not independently establish or verify, we have relied on statements and representations of representatives of K2 and/or Village Studios. We have assumed that the information and documents supplied to us by K2 and/or Village Studios and its designated representatives are complete and correct in all material respects.

We have also assumed that no other relevant documents have been withheld from us, whether deliberately or inadvertently, and the Documents were, when supplied, and continue to be, true, accurate, and not misleading in any way up to the date of this Opinion. We have further assumed that all information provided to us by K2 and/or Village Studios for the purpose of this Opinion is true, accurate, complete, and not misleading, and that neither the Company and/or Village Studios has withheld anything, that if disclosed to us, would reasonably cause us to alter this Opinion, in whole or part. We have assumed that the Documents provided to us remain in full force and effect up to the date of this Opinion, and have not been revoked, amended, varied, or supplemented, except as otherwise indicated in such Documents.

Our opinion expressed below is qualified and limited by the issues as set forth below relating to satisfaction of Section 181 Qualifications (each and collectively herein referred to as a "Qualification Issue" or "Qualification Issues"), as follows:

(a)     **Only the Owner of the production may elect to deduct production costs under Section 181.  An Owner is defined as any person that is required under Code Section 263A to capitalize the costs of producing a production into the cost basis or would be required to do so if Section 263A applied.**

On December 15, 2016, K2 entered into a certain Assignment Agreement and other documents with Village Studios (collectively, the "Assignment") providing for the purchase by K2 of 20 Class A Units of Pini USA, LLC.  We are advised that the Agreement has purportedly been canceled in its entirety by the parties thereto.  The execution of said Assignment could have an effect on Village Studios being deemed as a matter of federal income tax law a current owner of the Pilot notwithstanding the purported cancellation of the Assignment, and accordingly, this Opinion is qualified to the extent it is adversely determined that the execution of said Assignment would affect the determination whether Village Studio is currently the owner of the Pilot or otherwise preclude its election under Section 181.

Although it has been represented to us that Village Studios owns the Pilot, we are unable to verify this based on written documentation that this is, in fact, the case. We have not been furnished with a signed Operating Agreement of Village Studios which may contain limitations affecting the contemplated Transaction.

(b)     **First day of principal photography must have commenced prior to January 1, 2017.**

463126_11

K2 Energy Finance Group, LLC
April _____, 2017
Page 4

We have been orally advised by Village Studios that the first day of principal photography occurred on February 11, 2011. We have not independently confirmed same. If the actual first day of principal photograph were determined to be prior to January 1, 2008, then exceeding the $15,000,000 limitation on production costs would subject the production to disqualification under Section 181 with resulting recapture of all claimed deductions.

Neither Section 181 nor the regulations issued pursuant thereto specifically define what the "first day of principal photography" means. Accordingly, we are unable to express an opinion as to the sufficiency of the photography taken on said date to satisfy the requirement of a first day of principal photography having occurred. The YouTube connection furnished to us was one (1) minute twenty-four (24) seconds in duration and, although the actors could be seen speaking, their voices could not be heard on the YouTube version provided to us. Village Studios has represented to us that audible conversation is present in such material, but we are unable to verify this to be factual. Under Code Section 181, each episode of a television series is treated as a separate production. We are unable to opine on the adequacy of the first day of principal photography presented to us for the Pilot for use in subsequent episodes of the television series for purposes of elections under Section 181 for any such future episodes of the series.

(c)    **The production must be a "qualified television production" meaning that seventy five percent (75%) of the total compensation of the production paid to date must be "qualified compensation", which is compensation for services performed in the United States by actors, directors, producers, and other relevant production personnel.**

It appears from the 2014 Federal Income Tax Return of Village Studios that $150,000 of production costs were claimed as a deduction under Code Section 181 for the production Pini USA which we are advised by Village Studios is the name of the television series of which the Pilot is the first episode. An additional $2,275,018 of production costs were claimed on the 2015 Federal Income Tax Return of Village Studios.

We are not able to independently verify or opine that the requirement of a qualified television production set forth above has been met. As a purchaser of the Pilot, K2 must obtain substantiating detailed supporting information from Village Studios.

(d)    **A person that acquires a finished or partially finished production is treated as an owner of that production for purposes of Section 181 only if the production is acquired prior to its initial release or broadcast.**

We have orally been advised by Village Studios that this is the case, but have been unable to independently verify that this requirement has been satisfied.

K2 Energy Finance Group, LLC
April _____, 2017
Page 5

(e)     **A person that acquires only a limited license or right to exploit a production, or receives an interest or profit participation in a production as compensation for services, is not an owner of the production for purposes of Section 181.**

This requirement could be violated by reason of the execution of the Assignment dated December 15, 2016, which we are now advised was purportedly canceled and terminated by Village Studios and K2.  We render no opinion as to whether the apparent agreement between Village Studios and K2 to cancel and terminate the Assignment is legally effective or whether the purported cancellation and/or termination effectively cancels and terminates said Assignment.

(f)     **An owner may not make a Section 181 election until the first tax year in which the production costs for the television production have been paid or incurred, and the owner reasonably expects, based on all facts and circumstances, that: (1) the production will be set for production (or has been set for production); (2) the production will, upon completion, constitute a qualified television production.**

We are advised that the Section 181 election was initially made in the federal income tax return of Village Studios for the taxable year 2014 and an additional election was made in the 2015 federal income tax return of Village Studios.  We have been advised by Village Studios that said tax returns were timely filed but have not been able to independently verify said filings as timely made.  Additionally, we are unable to independently verify that the production costs for the production were, in fact, paid or incurred or the veracity of the owner's expectation set forth above in this subparagraph (f) based on all facts and circumstances as above provided.

(g)     **The term "production costs," under Section 181, includes costs paid or incurred by an Owner in acquiring a production prior to its initial release or broadcast.**

We are unable to find a definition under Code Section 181 of the term "incurred." A recourse promissory note given in consideration of the acquisition of a production may be challenged as not constituting a cost "incurred" in determining the applicable production costs.  We express no opinion as to the outcome of such a challenge.

(h)     **The regulations to Code Section 181 provide that the election must contain (a) the name or other unique identifying designation of the production, (b) the date aggregate production costs were first paid or incurred for the production,   (c) the amount of the aggregate production costs paid or incurred for the production during the taxable year, (d) the amount of**

K2 Energy Finance Group, LLC
April ____, 2017
Page 6

**qualified compensation paid or incurred for the production during the taxable year, (e) the amount of compensation paid or incurred for the production during the taxable year, and (f) if the Owner expects that aggregate production costs will be significantly paid or incurred in one or more of the areas as to which the $20,000,000 limitation applies, the identity of the area and the above specific information that took place within said area.**

The election made on the 2014 tax return of Village Studios reflected the entity, PINI USA, LLC, to the extent of $150,000 of claimed production cost.  An additional deduction of $2,275,018 of production costs was claimed on the 2015 federal income tax return for Pini USA, LLC.  The elections designated an entity (PINI USA, LLC) rather than the production itself.  The elections did not specify the amount of qualified compensation paid or incurred for the production during such taxable year or the amount of compensation paid or incurred for the production during such taxable year or the aggregate amount of compensation paid or incurred for the production in all prior taxable years.  The required declaration of continued expectation that the production will be set for production or has been set for production and that the production will be a qualified film or television production was inserted as a partner footnote in each of the K-1s setting forth the name of the applicable production, rather than in the body of the return itself which may be inadequate for purposes of making a proper election under Code Section 181.  No reference or information appears in the tax return which refers to areas to which the $20,000,000 limitation applies and accordingly such increased limitation ($20,000,000) would not be available.  The Summary Budget presented to us was for $20,084,634.86.

(i)     **Section 181 provides for a limited amount of aggregate production costs which may be claimed as a deduction when paid or incurred. This is limited to $15,000,000 unless production constitutes a live-action production where production costs are significantly paid or incurred within one or more areas, a low-income community or a distressed county or isolated area of distress, as provided in the Regulations.**

See reference to Qualification Issue (g) above.  Also, the purchase price per the Transaction ($10,000,000), assuming the Section 181 Election were effective, will reduce the future availability of qualified production costs available for claimed deduction under Section 181 for future years.  We are advised that $2,425,018 in the aggregate has been claimed in the aggregate for tax years 2014 and 2015.  We are unaware of the additional amount which may potentially be claimed for 2016.

Subject to the foregoing and subject to none of the foregoing Qualification Issues existing, occurring or being resolved adversely to the interest of K2 or the Transaction itself, each or any of which may negate the election under Code Section 181 and all or any of which may be applicable or asserted against K2, we are of the opinion that the Pilot has been qualified

K2 Energy Finance Group, LLC
April _____, 2017
Page 7

under Section 181 so as to allow K2 to claim a deduction for any qualified production costs, including the acquisition cost, paid or incurred by it in connection with the Pilot, subject to the applicable dollar limitations of Section 181 and substantiation of amounts claimed as a deduction.

The IRS may have a reasonable basis for challenging whether certain requirements were met. This Opinion is not sufficient, and may not be used, to avoid tax delinquencies, penalties, or recapture of any amount claimed as a deduction pursuant to Section 181.  This Opinion is also conditioned upon completion of the Company's acquisition of the Pilot.

This Opinion is rendered as of the date hereof, and we disclaim any obligation to update this Opinion or advise you of any changes in the event there is any change in legal authorities, facts, assumptions, or documents on which this Opinion is based. It is understood that this Opinion is limited to the matters and qualified by the Qualification Issues and other matters set forth herein as of the date hereof, and no opinion may be inferred or implied beyond the matters expressly contained herein or beyond the date hereof.

The Opinion expressed herein is rendered only to those to whom it is specifically addressed in connection with the proposed purchase of the Pilot in a Transaction as described herein and may not be relied on by any other person, or in connection with any other entity or transactions, even if undertaken by the person to whom this Opinion is addressed or with respect to any further sale or transfer of the Pilot. This Opinion is provided for the express purpose identified herein and may not be relied upon by, or disseminated to, any other persons or entities or used for any other purpose by anyone without our prior written consent.

Respectfully submitted,